# UNITED STATES *v.* PEWEE COAL CO., INC.

No. 168.   Argued January 2–3, 1951.—Decided April 30, 1951.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Acting Assistant Attorney General Clapp, Paul A. Sweeney* and *Melvin Richter.*

*Burr Tracy Ansell* argued the cause and filed a brief for respondent.

MR. JUSTICE BLACK delivered the judgment of the Court and an opinion in which MR. JUSTICE FRANKFURTER, MR. JUSTICE DOUGLAS, and MR. JUSTICE JACKSON joined.

Respondent, Pewee Coal Co., Inc., is a coal mine operator whose property was allegedly possessed and operated by the United States from May 1 to October 12, 1943, to avert a nation-wide strike of miners. Pewee brought this action in the Court of Claims to recover under the Fifth Amendment[1] for the total operating losses sustained during that period. After considering the evidence, the court held that there had been a "taking" entitling Pewee to compensation. It found the total operating loss to be $36,128.96, but rendered judgment for only $2,241.26, this amount being the portion of the operating loss which the court found attributable to Government operation of the mine. 115 Ct. Cl. 626, 88 F. Supp. 426. Pewee did not seek review here. We granted the Government's petition for certiorari[2] in which two questions are presented: (1) Was there such a taking of Pewee's property as to justify compensation under the Fifth Amendment? (2) If there was, does the record support the award of $2,241.26?

*First.* We agree with the Court of Claims that there was a "taking" requiring the Government to pay Pewee. The facts upon which this conclusion rests are set out in the findings and opinion below and need not be repeated in detail here. See 115 Ct. Cl. 626. The following are sufficient to show the general picture: On May 1, 1943, the President issued Executive Order 9340, 8 Fed. Reg. 5695, directing the Secretary of Interior ". . . to take immediate possession, so far as may be necessary

---

[1] ". . . nor shall private property be taken for public use, without just compensation." U. S. Const., Amend. V.

[2] 340 U. S. 808.

or desirable, of any and all mines producing coal in which a strike or stoppage has occurred or is threatened, . . . and to operate or arrange for the operation of such mines . . . ." On the same day, the Secretary issued an "Order for Taking Possession" of most of the Nation's mines, including Pewee's. 8 Fed. Reg. 5767. To convince the operators, miners and public that the United States was taking possession for the bona fide purpose of operating the mines, the Government formally and ceremoniously proclaimed that such was its intention. It required mine officials to agree to conduct operations as agents for the Government; required the American flag to be flown at every mine; required placards reading "United States Property!" to be posted on the premises; and appealed to the miners to dig coal for the United States as a public duty. Under these circumstances and in view of the other facts which were found, it should not and will not be assumed that the seizure of the mines was a mere sham or pretense to accomplish some unexpressed governmental purpose instead of being the proclaimed actual taking of possession and control. In *United States* v. *United Mine Workers,* 330 U. S. 258, there had been a government seizure of the mines under presidential and secretarial orders, which, insofar as here material, were substantially the same as those issued in the present case. We rejected the contention of the mine workers that "the Government's role in administering the bituminous coal mines [was] for the most part fictional and for the remainder nominal only." [3] We treated that seizure as making the mines governmental facilities "in as complete a sense as if the Government held full title and ownership." *Id.,* at 284–285. It follows almost as

---

[3] Brief for United Mine Workers of America and John L. Lewis, p. 32, *United States* v. *United Mine Workers,* 330 U. S. 258.

a matter of course from our holding in *United Mine Workers* that the Government here "took" Pewee's property and became engaged in the mining business.[4]

*Second.* Having taken Pewee's property, the United States became liable under the Constitution to pay just compensation. Ordinarily, fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's use. See *Kimball Laundry Co.* v. *United States,* 338 U. S. 1; *United States* v. *General Motors Corp.,* 323 U. S. 373. But in the present case, there is no need to consider the difficult problems inherent in fixing the value of the use of a going concern because Pewee neither claimed such compensation nor proved the amount. It proceeded on the ground that the Fifth Amendment requires the United States to bear operating losses incurred during the period the Government operates private property in the name of the public without the owner's consent. We believe that this contention expresses a correct general principle which under the circumstances of this case supports the judgment for $2,241.26.

Like any private person or corporation, the United States normally is entitled to the profits from, and must bear the losses of, business operations which it conducts. When a private business is possessed and operated for public use, no reason appears to justify imposition of

---

[4] The case of *Marion & Rye Valley R. Co.* v. *United States,* 270 U. S. 280, is cited by the Government as supporting its view that there was no "taking" here. In that case, however, the Court had "no occasion to determine whether in law the President took possession and assumed control" of a railroad. Instead, it dealt with the problem on the assumption that there was a "taking" and proceeded to decision on the finding that the railroad "was not subjected by the Government to pecuniary loss." This decision cannot be accepted as controlling the present case since whether there is a "taking" must be determined in light of the particular facts and circumstances involved.

losses sustained on the person from whom the property was seized. This is conceptually distinct from the Government's obligation to pay fair compensation for property taken, although in cases raising the issue, the Government's profit and loss experience may well be one factor involved in computing reasonable compensation for a temporary taking. Of course, there might be an express or implied agreement between the parties that the Government should not receive operating profits nor bear the losses, in which event the general principle would be inapplicable. But the possibility that such an agreement existed in the present case may be disposed of quickly. Pewee's failure to seek review here makes it unnecessary to consider whether the company consented to bear the disallowed and major portion of the losses sustained during the period of governmental control. And there is no indication that Pewee expressly or impliedly agreed to assume the loss of $2,241.26 which the court found mainly attributable to increased wage payments made to comply with a War Labor Board decision.

Where losses resulting from operation of property taken must be borne by the Government, it makes no difference that the losses are caused in whole or in part by compliance with administrative regulations requiring additional wages to be paid. With or without a War Labor Board order, when the Government increased the wages of the miners whom it employed, it thereby incurred the expense. Moreover, it is immaterial that governmental operation resulted in a smaller loss than Pewee would have sustained if there had been no seizure of the mines. Whatever might have been Pewee's losses had it been left free to exercise its own business judgment, the crucial fact is that the Government chose to intervene by taking possession and operating control. By doing so, it became the proprietor and, in the absence of con-

trary arrangements, was entitled to the benefits and subject to the liabilities which that status involves.

The judgment of the Court of Claims is

*Affirmed.*

MR. JUSTICE REED, concurring.

I agree that in this case there was a "taking" by eminent domain that requires the Government to pay just compensation to the owner of the property for its use. However, it is impossible for me to accept the view that the "taking" in this case requires the United States to bear all operating losses during the period it controls the property without the owner's consent or agreement. Such a view would lead to disastrous consequences where properties necessarily taken for the benefit of the Nation have a long record of operating losses, *e. g.,* certain railroads, coal mines, or television broadcasting stations. The question of who bears such losses is not, I think, "conceptually distinct" from the question of just compensation. Losses or profits on the temporary operation after the declaration or judgment of taking are factors to be taken into consideration in determining what is just compensation to the owner.

This is a temporary taking. The relatively new technique of temporary taking by eminent domain is a most useful administrative device: many properties, such as laundries, or coal mines, or railroads, may be subjected to public operation only for a short time to meet war or emergency needs, and can then be returned to their owners. However, the use of the temporary taking has spawned a host of difficult problems, *e. g., United States* v. *General Motors Corp.,* 323 U. S. 373; *United States* v. *Petty Motor Co.,* 327 U. S. 372; *Kimball Laundry Co.* v. *United States,* 338 U. S. 1, especially in the fixing of the just compensation. Market value, despite its difficulties, provides a fairly acceptable test for just compensation when the property is taken absolutely. See

*United States* v. *Miller,* 317 U. S. 369; *United States* v. *John J. Felin & Co.,* 334 U. S. 624; *United States* v. *Toronto Navigation Co.,* 338 U. S. 396; *United States* v. *Commodities Trading Corp.,* 339 U. S. 121. But in the temporary taking of operating properties, *e. g., Marion & Rye Valley R. Co.* v. *United States,* 270 U. S. 280; *United States* v. *United Mine Workers of America,* 330 U. S. 258, market value is too uncertain a measure to have any practical significance. The rental value for a fully functioning railroad for an uncertain period is an unknowable quantity. This led to a government guarantee of earnings in the First World War, 40 Stat. 451. Cf. *United States* v. *Westinghouse Electric & Mfg. Co.,* 339 U. S. 261. The most reasonable solution is to award compensation to the owner as determined by a court under all the circumstances of the particular case.

Temporary takings can assume various forms. There may be a taking in which the owners are ousted from operation, their business suspended, and the property devoted to new uses. *United States* v. *General Motors Corp.,* 323 U. S. 373; *United States* v. *Petty Motor Co.,* 327 U. S. 372; *Kimball Laundry Co.* v. *United States,* 338 U. S. 1. A second kind of taking is where, as here, the Government, for public safety or the protection of the public welfare, "takes" the property in the sense of assuming the responsibility of its direction and employment for national purposes, leaving the actual operations in the hands of its owners as government officials appointed to conduct its affairs with the assets and equipment of the controlled company. Examples are the operation of railroads, motor carriers, or coal mines. *Marion & Rye Valley R. Co.* v. *United States,* 270 U. S. 280; *United States* v. *United Mine Workers of America,* 330 U. S. 258.

When, in a temporary taking, no agreement is reached with the owners, the courts must determine what pay-

ments the Government must make. Whatever the nature of the "taking," the test should be the constitutional requirement of "just compensation." However, there is no inflexible requirement that the same incidents must be used in each application of the test.

So far as the second kind of temporary "taking" is concerned, the Government's supervision of a losing business for a temporary emergency ought not to place upon the Government the burden of the losses incurred during that supervision unless the losses were incurred by governmental acts, *e. g.*, if the business would not have been conducted at all but for the Government, or if extra losses over what would have been otherwise sustained were occasioned by Government operations. Where the owner's losses are what they would have been without the "taking," the owner has suffered no loss or damage for which compensation is due. Cf. *Marion & Rye Valley R. Co.* v. *United States,* 270 U. S. 280. The measure of just compensation has always been the loss to the owner, not the loss or gain to the Government. *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195.

Here the Court of Claims has correctly applied these principles in a case of a losing operation in a temporary taking. It has found that a certain sum was expended without legal or business necessity so to do. This sum was the extra allowance paid at the direction of the United States under a certain War Labor Board recommendation that had no legal sanction. 50 U. S. C. App. § 1507; E. O. 9017, 3 CFR, 1943 Cum. Supp., 1075. I would not overturn its finding in this case and would therefore affirm.

Mr. Justice Burton, with whom The Chief Justice, Mr. Justice Clark and Mr. Justice Minton concur, dissenting.

I agree that there was a "taking" of the mining property from May 1 to October 12, 1943, but I find no

ground for allowing the respondent to recover the sum here sought as compensation for such taking.

This case is within the principle stated in *Marion & R. V. R. Co.* v. *United States,* 270 U. S. 280, 282, as follows: "[E]ven if there was technically a taking, the judgment for defendant was right. Nothing was recoverable as just compensation, because nothing of value was taken from the company; and it was not subjected by the Government to pecuniary loss. Nominal damages are not recoverable in the Court of Claims."

Here there is no showing by the company of any rental value due it as compensation for the Government's possession of its properties. There is no showing that anything of compensable value was taken by the Government from the company, or that the Government subjected the company to any pecuniary loss. The dissenting judge in the Court of Claims pointed out that—

> "This extra expense consisted of an increased vacation allowance to the plaintiff's workmen, and the refund to them of occupational charges like rentals on mine lamps. The court has not found that the plaintiff [company] could have operated its mine without making the concessions directed by the War Labor Board, nor has it found what the losses to the plaintiff would have been if the Government had not intervened and the strike had continued. I think that the court is not justified in awarding the plaintiff the amount of these expenditures when it does not and, I think, could not, find that the plaintiff was, in fact, financially harmed by the Government's acts." 115 Ct. Cl. at 678–679, 88 F. Supp. at 431.

Accordingly, I would reverse the judgment of the Court of Claims and allow no recovery by the respondent.