**UNITED STATES of America,**
**Plaintiff,**

v.

**883.89 ACRES OF LAND, MORE OR LESS, Situate IN SEBASTIAN COUN-TY, STATE OF ARKANSAS; Peerless Coal Company, et al. and Unknown Owners, Defendants.**

**Civ. A. No. 2072.**

United States District Court,
W. D. Arkansas,
Fort Smith Division.

June 29, 1970.

Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for plaintiff.

Daily & Woods, Fort Smith, Ark., for defendants.

OPINION

JOHN E. MILLER, Senior District Judge.

On June 2, 1967, plaintiff, United States of America, commenced this action to acquire under eminent domain the temporary use of 883.89 acres of land, more or less, situate in Sebastian County, Arkansas, needed for the operation of a military training camp. 10 U.S.C.A. § 2263.

The estate or interest taken was a term for years "beginning July 1, 1967, and ending June 30, 1967, extendible for yearly periods thereafter at the election of the United States until June 30, 1972, notice of which election shall be filed in the proceeding at least 30 days prior to the end of the term hereby taken, or subsequent extensions thereof, together with the right to remove within a reasonable time after the expiration of the term taken or any extension thereof, any and all improvements and structures heretofore or hereafter placed thereon by or for the United States; subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines."

The Government designated the property taken as Tract No. 597 containing 40.59 acres and Tract No. 597–B containing 843.80 acres. Both tracts were specifically described in Exhibit A to the complaint.

Estimated just compensation in the sum of $1,700.00 was deposited in the registry of the court upon the filing of the complaint for the period ending June 30, 1968, and a similar deposit has been made for subsequent years.

On June 20, 1967, the defendant Peerless Coal Company, a corporation, filed its answer in which it denied that the property described as Tract 597–B "is needed or necessary for public use for military purposes or for any other public use authorized by Congress or Executive Order"; alleged that the taking is not in good faith and is capricious and arbitrary and without adequate determining principle or was unreasoned and

amounts to a taking of property without due process of law; and prayed that the complaint be dismissed as to Tract 597–B or, in the alternative, if dismissal is denied, that the defendant be awarded fair, full and just compensation for the taking of both tracts.

On June 21, 1967, the court sustained plaintiff's motion to dismiss the portions of the answer containing the defendant's allegations of the lack of power or authority of plaintiff to maintain the action. United States v. Willis, (8 Cir.1954) 211 F.2d 1; United States v. Mischke, (8 Cir.1961) 285 F.2d 628.

The parties were unable to stipulate or agree on the amount due as fair compensation.

On April 24, 1970, the case was set for trial to the court on Thursday, May 21, 1970.

At the trial the Government introduced one witness, Mr. Gus Clifton, an appraiser for the Corps of Engineers of the United States Army, together with Exhibits 1 and 2, segment maps attached to the complaint. No question was made as to the qualifications of witness.

Tract No. 597 contains 40.59 acres of sandstone ridge land, upon which there is a small amount of Bermuda, sericea, Kobe and Korean lespedeza, and various kinds of wild grasses and underbrush of varying heights and thickness. The tract is three-fourths of a mile north of Greenwood, Arkansas, and the elevation is approximately 500 feet. The highest and best use of the land is for pasture of livestock.

Tract No. 597–B is situated about four miles east of Greenwood, Arkansas, and contains 843.03 acres. Approximately 250 acres is loamy prairie land and 593.03 acres is sandstone ridge land. Approximately half of the ridge land is open but has trees and brush 15 or 20 years old growing thereon, and the remainder is in woodland. The woodland has little merchantable timber. The elevation is from 500 to 700 feet m.s.l. The highest and best use of the tract is for pasture. The fair rental value of the entire acreage per year is $2,400.00.

The witness had compiled a list of six tracts which he considered similar to the land involved. The rentals ranged from $1.75 to $4.00 per acre for open pasture land and 25 cents per acre for woodland. The witness specifically compared three tracts of land to the larger tract, No. 597–B. One of the tracts contained 160 acres lying adjacent to the southwest portion of the tract. In that tract there were 50 acres of cleared land and 110 acres in woodland. The rental was $4.00 per acre for the cleared land and 25 cents per acre for the woodland. He also compared another tract containing 400 acres located six miles north of Tract 597–B. About half of the tract was open and the topography and drainage and other characteristics that make up pasture land were similar to the land involved. The rental for the entire 400 acres is $600 a year, or calculated at $2.75 per acre for 200 acres of open land and 25 cents an acre for 200 acres of woodland.

He further testified that other tracts which he considered comparable to the land involved herein had renting for several years for lesser rent than the two tracts specifically described by the witness.

The rental contracts on the land compared by the witness to the defendant's land were oral and had been rented for several successive years.

At the conclusion of plaintiff's testimony, the learned attorney for the defendant made the following statement:

"Before I commence, with the Court's permission, I would like to briefly state the landowners' theory that we are going to pursue, if it please the Court, so that you will know where I am going.

"My professional appraisers advise me that it is their considered judgment and opinion that there are and have been no economic rents or leases of comparable property in the area during the period involved. It is their

view that such rentals that have been pointed out that occurred in the area involved are not valid economic arm's-length transactions, and therefore they have arrived at a fair rental value predicated upon the rule that has been approved by a number of courts, enunciated by Judge Trieber in the World War I condemnation case of land in the area of Fort Robinson, in which he points out that where the subject property is unsuited for cultivation and is not economically rentable property on the rental market, that the proper measure of evaluation for a four year rental term is fair market value of the property multiplied by the current economic [rate of] interest."

Following this statement, Mr. Johnson, Assistant United States Attorney, stated:

"May I have a continuing objection to that type of testimony so I won't be having to interrupt all the time."

The Court: "All right, sir. Let the record so show."

The defendant introduced as its chief witness Mr. Jimmie Taylor, a realtor and resident of Fort Smith, Arkansas. The description of the two tracts of land by the witness for plaintiff and by Mr. Taylor varied only in details. Mr. Taylor had been familiar with the two tracts in excess of seven years, and at the time of the trial had been managing the real estate interests of the defendant, Peerless Coal Company, in Sebastian County for the purpose of sale and other disposition. In connection with this witness' testimony, defendant introduced its Exhibit 1 showing the location of the two tracts in connection with other lands in the general area with which the witness was familiar.

The small tract, No. 597, has been used by plaintiff for small-arms firing while the larger tract, No. 597–B, is in the artillery area.

The valleys in the larger tract were used for farming in years past. Some of the land might be described as "craw-fishy," that is, a type of soil that would grow any and all types of crops, but the productivity for crops would be on a minimum basis. The maximum use of the land would be for pasture. Both tracts were considered on the same basis by Mr. Taylor in his investigation. Since 1967 there have been sales of several tracts of land of varying sizes in the general area. Other lands in the area were being held for sale or for future use. The owners were not financially able to improve their lands sufficiently to support the number of cattle requisite to financial success, resulting in the lands being rented for the interim period. The witness detailed his experience with leases and other types of land. Then he detailed his experience with rentals of lands for grass or for ranching purposes and stated that it was very doubtful that the land could be put back into the use in which it was in 1967 because of the growth of small trees, and for the purpose of determining the fair rental value of the lands involved herein the witness did not discover any comparable rental or leased property in the general area.

The witness fixed the fair market value of the land as of the time the suit was filed at $100 per acre, and in calculating the rental per year he increased the value of the land by six percent each year because that was the "national average." The following questions were propounded by counsel for defendant:

"Q. Applying the prevailing commercial interest rate to that fair market value over the years in question, what have you arrived at as the fair market value?

A. I believe that you asked earlier, you suggested that we break this down on an annual basis.

Q. Yes, sir.

A. I can do that. I have it broken down that the value of the leasehold and option interest taken by condemnation over a five year period is a total of $42,725.00. I find this to be for the year 1967, that would

be June 30 to July, 1968, $7,-071.00." (Tr. 34–35.)

He figured the other yearly rentals as follows:

| | |
|---|---|
| for 1968–69 | $7,495.00 |
| for 1969–70 | $8,909.00 |
| for 1970–71 | $9,386.00 |
| for 1971–72 | $9,864.00 |

"Q. Now, that increase you have explained as increase in the market value that you have observed that has occurred plus or minus any change in interest rate?

A. Yes, sir. That is based upon the interest rate that we find prevalent in the market, as well as the interest rate that an investor expects upon the return of his land in an interim period that is being used by others. I also want to point out that these leases are being tied and have been for this period of time to the Consumers Cost Index, so if the economy fluctuates up or down, these can be adjusted.

Q. You say these leases, you are now speaking of what leases?

A. I am speaking of leases that would be in the market that are based on a fair market value.

Q. Leases that are in effect in this area?

A. Yes, sir.

Q. On this type of property?

A. Not on this type of property, but I am talking about leases that are in effect for property based upon the valuation.

Q. All right.

A. I did not find, however—I contradict. I did not find any leases for this land, as I pointed out, but there are leases in the market.

Q. That are current tracts that are in the leasing market in this area?

A. That's correct." (Tr. 36–37.)

The defendant also called as a witness Mr. A. J. Standiford, a professional realtor and resident of the City of Fort Smith, who worked with Mr. Taylor in appraising and compiling the appraiser's report from which Mr. Taylor testified. The following questions were propounded:

"Q. Do you have anything to add to it, or do you disagree with him in any way?

A. I think he did an excellent job. If it please the Court, I would like to bring out just one or two definitions which were basic in which we arrived at our decision when we went through the process of arriving at the fair market value. I think one of the basic decisions that we had to make was the definition as it relates to valuation of the leasehold estate typically found in the area. I think we would define it as an interest in land or a property right held under tenure of lease and would grant to the leasehold interest the right of possession and the right of enjoyment by virtue of a lease agreement, stating the conditions of the payment and terms. There are two definitions that I would like to bring out. One is the contract rent. The contract rent on a leasehold is the amount in terms a willing lessor will take and a willing lessee will pay for the use of a particular piece of property, both parties having full knowledge of the facts and potential use of that property. Now the only other definition I think should be in the record is economic rent, because this is the main pattern of our appraisal, you might say. Economic rent would be defined as the amount of money typically and contractually paid as rent for a particular piece of property for particular use. And

the basis of our appraisal was that this right that the Government had taken was not typical, and we could not find a typical economic rent in the area. That we could find the contractual rent for pasture land, but since the Government virtually took away the right of disposition in the market, this is what our case is based on. And this is the principal procedure that we utilized to arrive at the value which Mr. Taylor brought out."

The plaintiff contends that just compensation or the rental value of the land is $2,400.00 per year in accordance with the testimony of the appraiser, Mr. Clifton, who based his opinion upon a study of the annual rentals of other comparable lands in the area.

■ The court cannot accept the theory or the contention of defendant, but is of the opinion that the measure of damages for a temporary taking of property for public purpose is the rental value of the interest during the period taken for the following reasons.

In support of its contention the defendant on its brief quotes from In Re Condemnation of Lands for Military Camp, (W.D.Ark.1918) 250 F. 314:

"If the land is wild, and not subject to cultivation, the rental should be the prevailing rate of interest on its fair value."

The land involved in this proceeding was not wild. The open land had doubtlessly been farmed many years ago, but was practically abandoned before it was purchased by defendant and all farming activities ceased. As stated by Mr. Taylor, the witness for the landowner, the "productivity for crops would be on a minimum basis." This accounts for the heavy growth of young trees, sprouts, etc. It could not be reconverted to agricultural land without the expenditure of an enormous sum of money, and again, as Mr. Taylor said, the average man was unable financially to convert such land into a profitable farming operation and, likewise, could not extensively engage in the cattle business without establishing profitable but expensive pastures.

Judge Trieber was considering an entire area which was acquired for the establishment of Camp Pike (Robinson) near Little Rock in 1918. At page 315 of 250 F. he stated:

"If it appears from evidence at the trial that the improvements on a tract of land will necessarily have to be destroyed, either wholly or in part, the owner is entitled to compensation for their value, and in such cases the rental value will be for the land, without these improvements."

In the case before the court there is no question of improvements. They had evidently deteriorated to such an extent as to be worthless prior to the acquisition by the Government, and the court was correct in stating that where there were no improvements "the rental value will be for the land, without these improvements."

In 27 Am.Jur.2d § 351, Eminent Domain, p. 190, the rule is stated as follows:

"In some instances the courts have, in general terms, expressed the view that where land has been appropriated for a temporary use, the measure of compensation is what the property is worth for the time during which it is held. More specifically, the view has been taken that the measure of damages for a temporary taking of property for a public purpose is the rental value of such property during the period taken."

In an annotation, 3 A.L.R.2d, page 286, the author has cited on page 290 decisions from a great many jurisdictions holding that the measure of damages for a leasehold interest taken under eminent domain is the fair market value of the leasehold.

An annotation, "Elements and Measure of Compensation in Eminent Domain for Temporary Use and Occupancy," is found in 7 A.L.R.2d beginning at

page 1297. On page 1298 the author states:

"Cases concerning temporary use and occupancy are to be distinguished from those concerning a temporary injury of property or a temporary deprivation of the use of property because of the near-by construction of some public improvement.

\* \* \* \* \* \*

"An examination of the cases on the subject of the annotation reveals that the practice of taking temporary use and occupancy for a public purpose is of comparatively recent origin. This fact is noted in a number of cases collected in the annotation and, as a matter of interest, only two cases (both involving the same parties) concerning the point in question appear to have arisen prior to World War I.

"Because of the fact that condemnation of property for a temporary period is of such recent origin that the law applicable to temporary takings is not as fully developed as in other instances of eminent domain, only a few generalizations on the subject are possible.

"The courts are generally in accord that the measure of damages for the temporary taking of property under eminent domain is the rental value of the property for the period taken."

In the case of Kimball Laundry Co. v. United States, eminent domain proceedings were instituted by the Government to acquire the right to temporary use and occupancy of defendant's laundry to provide laundry and dry cleaning services for members of the armed forces. On an appeal from the District Court, the Court of Appeals for the Eighth Circuit, on March 11, 1948, 166 F.2d 856, affirmed the judgment of the trial court. Certiorari was granted, and on June 27, 1949, the Supreme Court of the United States in its opinion, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765, beginning at page 1438 of 69 S.Ct. said:

"The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent. Its measure is the amount of that equivalent. But since a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place. If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the 'market price' becomes so important a standard of reference. But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. Cf. Old South Association [in Boston] v. Boston, 212 Mass. 299, 99 N.E. 235. These considerations have special relevance where 'property' is 'taken' not in fee but for an indeterminate period.

"Approaching thus the question of compensation for the temporary taking of petitioner's land, plant, and equipment, we believe that the award made by the District Court was correct. Petitioner insists, however, that the measure of compensation for a temporary taking which should have been applied is the difference between the market value of the fee on the date of the taking and its market value on the date of its return. But it was known from the outset that this taking was to be temporary, and determination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations. We agree with both lower courts,

therefore, that the proper measure of compensation is the rental that probably could have been obtained, and so this Court has held in the two recent cases dealing with temporary takings. United States v. General Motors Corp., 323 U.S. 373, 65 S. Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390; United States v. Petty Motor Co., 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729." The case was reversed on other grounds, but the general rule which this court feels is applicable in the instant case was approved by the Supreme Court.

United States v. Pewee Coal Co., (1951) 341 U.S. 114, 71 S.Ct. 670, 95 L. Ed. 809, was a suit which the coal company brought against the United States to recover operating losses sustained during the time that the United States had possession and control of plaintiff's mine pursuant to Executive Order of the President. At page 672 of 71 S.Ct. the court said:

"Having taken Pewee's property, the United States became liable under the Constitution to pay just compensation. Ordinarily, fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's use. See Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S. Ct. 1434, 93 L.Ed. 1765; United States v. General Motors Co., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311."

In United States v. Leavell & Ponder, Inc., (5 Cir.1961) 286 F.2d 398, the Government appealed from an award in a condemnation of a Wherry Housing Project. One of the grounds upon which the appeal was based was that "in making a finding of value based on the capitalization of anticipated income from the property the Commission utilized a 4½% rate of return which was unrealistic and without support in the evidence." There were numerous other objections to the award which are not relevant in the instant case. Objection was made by the United States during the hearings to the reception of evidence on the rate of return on certain types of corporate securities and evidence that this equity would be a conservative investment. In discussing the objection the court at page 407 said:

"There is no place in valuation proceedings for such testimony. For one to give an opinion on value he is ordinarily required to base such opinion on knowledge of sales at arm's length and without compulsion of comparable properties or on knowledge of the rate of return which the ordinary prudent investor requires in order to invest in a comparable project when he has complete freedom of choice."

The interest acquired by the Government in the instant case was simply the right to use the property for a period of years. The witnesses for the defendant based their opinion as to just compensation on leases of land that were tied to the Consumers Cost Index. In response to the question propounded by counsel for the defendant, the witness Taylor said that he was speaking of leases that would be in the market that are based on a fair market value. Counsel then asked the witness if he was referring to leases on this type of property, and the witness replied: "Not on this type of property but I am talking about leases that are in effect on property based upon the valuation." Continuing, the witness said: "I did not find any leases for this land as pointed out but there are leases on the market." Thus, the witness' estimate of just compensation was based upon the prevailing interest rate rather than the rate of return on comparable property. The conclusion of the defendant's witnesses as to the amount of just compensation that should be awarded is based entirely upon speculation and not upon conditions that existed and still exist in comparable areas for comparable land. The market referred to by the witnesses is the market for leases for a term of years on commercial property which leases are usually tied to the Consumers Cost Index, so the if the economy fluctuates, the rental may be adjusted accordingly.

The other witness for the defendant, Mr. Standiford, defined two types of

leasehold estates. One type was designated as the "contract rent," and defined by the witness as being the amount in terms a willing lessor will take and a willing lessee will pay for the use of a particular piece of property, both parties having full knowledge of the facts and the potential use of the property. The other type is referred to as "economic rent, because this the main pattern of our appraisals." He defined "economic rent" as "the amount of money typically and contractually paid as rent for a particular piece of property for particular use." The objection of the defendant is that the property was taken by the plaintiff in the exercise of the right of eminent domain and could not be considered as a typical contract lease. The witness also stated that "we couldn't find a contractual rent lease in the entire area," although they could find the contractual rent for pasture land, but the Government took away the right of disposition in the market and "this is what our case is based on."

The defendant is a well-advised owner of large areas of land acquired primarily for the purpose of mining coal. The record is silent as to whether the coal in and underlying the land involved herein has been exhausted. The witnesses for defendant were aware of the well-established amount of rentals of comparable land and the custom prevailing in the area relative to yearly or short-time renewals, but testified that the option for yearly renewal obtained by plaintiff requires a higher rental which should be determined by the market value of assignable leases on industrial property.

The Government needed this property in carrying out its military training program. The land was idle, unproductive, and was affording no revenue to the owner from the surface of the land. Under all of the facts, when viewed realistically, no reason exists for this court to depart from the general rule for fixing just compensation and approve a rule that is not applicable to the rental of property such as was taken in this case. The 1918 opinion of Judge

Trieber was advisory and in no way supports the contentions of defendant. Other landowners in the area must be considered as being ordinarily prudent in handling their property. They leased their similar property to persons for the well-established prevailing rental.

The defendant did not controvert the evidence of plaintiff as to the amount of rental due it under the relevant facts and the applicable law.

Therefore, judgment is being entered today fixing the fair rental of the property at $2,400.00 per year, or $12,000.00 for the entire period, with interest at the rate of 6 percent per annum from the due date of the rentals until paid.