**CALIFORNIA HOUSING SECURITIES, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 91–5092.

United States Court of Appeals, Federal Circuit.

March 24, 1992.

Robert K. Huffman, Miller & Chevalier, Washington, D.C., argued, for plaintiff-ap-pellant. With him on brief was Leonard Bickwit, Jr.

Shalom Brilliant, of the Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., and David M. Cohen, Director.

Before RICH, NEWMAN and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

California Housing Securities, Inc. (CHS) appeals from an order of the United States Claims Court, No. 90–467C (April 2, 1991), granting summary judgment to the United States. The Claims Court held that the appointment and subsequent actions of the Resolution Trust Corporation (RTC) as conservator and receiver of Saratoga Savings and Loan Association (Saratoga) were not a compensable taking under the fifth amendment to the United States Constitution. We affirm.

I

CHS became the sole owner of Saratoga, a federally-insured savings and loan association, one year after Saratoga became a California-chartered savings and loan association in 1983. California requires its state-chartered savings associations to participate in the federal deposit insurance program. Cal.Fin.Code § 5606(a) (West 1991).

In 1983, the federally-insured savings and loan industry was governed by three major statutes enacted in the 1930's: the Federal Home Loan Bank Act, Pub.L. No. 72–304, 47 Stat. 725 (1932) (codified as amended at 12 U.S.C. §§ 1421–1449 (1988)), the Home Owners' Loan Act of 1933, Pub.L. No. 73–43, 48 Stat. 128 (1933) (codified as amended at 12 U.S.C. §§ 1461–1468 (1988)), and the National Housing Act, Pub.L. No. 73–479, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (1988)). Saratoga applied for and received federal deposit insurance from the Federal Savings and Loan Insurance Corporation (FSLIC) which operated under the direction of the Federal Home Loan Bank

Board. 12 U.S.C. §§ 1725(a), 1726(a)(2) (1988) (repealed by Pub.L. No. 101–73, 103 Stat. 363 (1989)).

As one of many operating conditions required of federally-insured associations, Saratoga pledged that it would "not carry on any sales plan or practices, or any advertising, in violation of regulations to be made by [FSLIC]." 12 U.S.C. § 1726(b) (1988) (repealed 1989). At that time, Saratoga understood that the Federal Home Loan Bank Board could appoint FSLIC as conservator or receiver of a federally-insured savings and loan association, 12 U.S.C. § 1729(c) (1988) (repealed 1989), when certain criteria were met, including:

> substantial dissipation of assets or earnings due to any violation or violations of law, rules or regulations, or to any unsafe or unsound practice or practices[.]

12 U.S.C. § 1464(d)(6)(A)(ii) (1988) (amended by Pub.L. No. 101–73, 103 Stat. 282 (1989)). FSLIC had "the authority to liquidate such institution in an orderly manner or to make such other disposition of the matter as it deem[ed] to be in the best interests of the institution, its savers, and [FSLIC]." 12 U.S.C. § 1729(c)(3)(B) (1988) (repealed 1989).

In 1989, the structure of agency responsibility for governing federally-insured savings and loan associations was revised. Congress, acting in response to the crisis in the savings and loan industry, enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (1989). FIRREA abolished the Federal Home Loan Bank Board. Pub.L. No. 101–73, § 401(a)(2) (1989) (codified at 12 U.S.C. § 1437 note (Supp. II 1990)). At the same time, FIRREA provided federal insurance for associations like Saratoga through the Savings Association Insurance Fund. 12 U.S.C. §§ 1813(c)(2), 1814(a)(2) (Supp. II 1990). FIRREA created the Office of Thrift Supervision (OTS) in the Department of the Treasury, and made it responsible for the examination, supervision, and regulation of all federally insured savings associations. 12 U.S.C. §§ 1462a, 1463 (Supp. II 1990). FIRREA also created the RTC and charged it with resolving the cases of savings and loan associations closed between January 1989 and August 1992, taking over FSLIC's role as conservator or receiver. 12 U.S.C. § 1441a(b) (Supp. II 1990).

FIRREA authorizes the director of OTS, in place of the now defunct Federal Home Loan Bank Board, to appoint the RTC as conservator or receiver of a federally-insured state savings association (such as Saratoga) if one or more statutory ground exists, including:

> substantial dissipation of assets or earnings due to any violation or violations of law or regulations, or to any unsafe or unsound practice or practices[.]

12 U.S.C. § 1464(d)(2)(C)(ii) (Supp. II 1990). The RTC has authority to resolve an association's problems by merging it with another insured depository association or transferring any asset or liability of the association. 12 U.S.C. §§ 1441a(b)(4), 1821(d)(2)(G) (Supp. II 1990). After the RTC pays all claims and administrative expenses, the remaining funds are transferred to the depository association's shareholders. In this case such a transfer would be to CHS as sole shareholder. 12 U.S.C. § 1821(d)(11)(B) (Supp. II 1990).

On November 8, 1989 OTS appointed the RTC conservator for Saratoga. Saratoga challenged the validity of the RTC's appointment as conservator in the U.S. District Court for the District of Columbia pursuant to 12 U.S.C. § 1464(d)(2)(E), (G) (Supp. II 1990). *Saratoga Savings and Loan Ass'n v. Ryan*, Civ. Action No. 89–3305. The district court has not yet issued a judgment in that case. On November 9, 1989 the RTC entered and took possession of Saratoga's offices in California. On May 24, 1990 OTS appointed the RTC as receiver of Saratoga. The RTC liquidated most of Saratoga's assets and liabilities on June 1, 1990.

II

CHS filed a complaint in the Claims Court on May 30, 1990 alleging that OTS and the RTC had taken Saratoga's property in violation of the fifth amendment of the

United States Constitution which commands that "private property [shall not] be taken for public use, without just compensation." The Claims Court determined that the appointment of the RTC as conservator, and then receiver, of Saratoga and the RTC's subsequent transfer of Saratoga's assets to a new association did not constitute a fifth amendment taking. *California Hous.Sec., Inc. v. United States*, No. 90–467C, Order of Judge Andewelt (Cl.Ct. Apr. 2, 1991). The Claims Court's judgment relied on the reasoning articulated in *American Continental Corp. v. United States*, 22 Cl.Ct. 692 (1991), which concerned the government's seizure and liquidation of Lincoln Savings and Loan Association. In *American Continental*, the Claims Court determined that the government's actions did not constitute a compensable regulatory taking because these actions promoted the public interest in a sound banking system and because they did not interfere with the investment-backed expectations of the savings and loan association or of its corporate parent, American Continental. The court also rejected American Continental's attempt to characterize the government's actions as a taking of property by permanent physical occupation, under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), because the association and its parent lacked any historically rooted expectation of compensation for the regulatory action taken. "To the contrary, plaintiffs' expectations could only be that regulators would exert physical control over Lincoln's assets if the Board made a finding that Lincoln was in 'an unsafe or unsound condition to transact business.'" *American Continental*, 22 Cl.Ct. at 700.

### III

The sole contention of CHS on appeal is that the actions of OTS, in appointing the RTC as conservator and receiver of Saratoga, and the RTC's subsequent actions as conservator and receiver of Saratoga resulted in a permanent occupation and physical taking of Saratoga's property in violation of the fifth amendment's taking clause.[1] CHS's legal theory thus relies on *Loretto*.[2] In that case, the Supreme Court held that a New York statute requiring a landlord to permit installation of cable television facilities on her property at a government-fixed rate was a fifth amendment taking because it constituted a permanent physical occupation of her property. *Loretto*, 458 U.S. at 438–41, 102 S.Ct. at 3177–79. In particular, the Supreme Court stated that "a permanent physical occupation authorized by [the] government is a taking without regard to the public interests that it may serve." *Id.* at 426, 102 S.Ct. at 3171. Consequently, "a permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." *Id.* at 432, 102 S.Ct. at 3174. In sum, "when the 'character of the governmental action,' [*Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)], is a permanent physical occupation of property, [the Supreme Court's] cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 434–35, 102 S.Ct. at 3175–76.

CHS urges us to follow the language of *Loretto* simply because the government en-

---

**1.** Because CHS does not make a "regulatory" taking claim, we have no occasion to consider whether a "physical occupation" taking claim can be established on the same facts which would disprove a "regulatory" taking.

**2.** The government argues that CHS lacks standing to sue individually or derivatively on behalf of Saratoga. The government also states, however, that this court would have jurisdiction over CHS's complaint if it could be construed as filed by a sole shareholder on behalf of a corpo-

ration alleging that compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest pursuant to 12 U.S.C. § 1821(d)(11)(B) (Supp. II 1990). We read CHS's complaint to claim such a surplus and therefore reject the government's challenge of CHS's individual standing to sue. We thus need not decide whether the Claims Court is authorized to entertain a shareholder derivative suit or whether other grounds exist for suit by CHS individually.

tered and took possession of Saratoga's property when acting as conservator and receiver of that association. CHS, however, does not come to grips with the distinction between the property rights Saratoga possessed at the time of its occupation and seizure and those with which the state interfered in *Loretto*. The ground for that distinction is unmistakably identified in *Loretto*:

> Our holding today is very narrow. We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation, and the character of the invasion is qualitatively more intrusive than perhaps any other category of property regulation. We do not, however, question the equally substantial authority upholding a State's broad power to impose appropriate restrictions upon an owner's *use* of his property.

458 U.S. at 441, 102 S.Ct. at 3179 (emphasis in original).

The RTC's occupation and seizure of Saratoga, and its subsequent liquidation of Saratoga's assets, cannot constitute a physical fifth amendment taking because neither Saratoga nor CHS could have developed a historically rooted expectation of compensation for such a seizure. Saratoga did not possess the most valued property right in the bundle of property rights, the right to exclusive possession, or stated conversely the right to exclude others, at the time of the alleged taking in this case. The power to exclude is an essential element of property ownership. It "has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto*, 458 U.S. at 435–36, 102 S.Ct. at 3175–76 (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) and Restatement of Property § 7 (1936)). *See also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831, 107 S.Ct. 3141, 3145, 97 L.Ed.2d 677 (1987), quoting *Loretto*, 458 U.S. at 433, 102 S.Ct. at 3175, quoting *Kaiser Aetna*, 444 U.S. at 176, 100 S.Ct. at 391 ("We have repeatedly held that, as to property reserved by its owner for private use, 'the right to exclude [others is] "one of the most essential sticks in the bundle of rights that are commonly characterized as property." ' "); *Kaiser Aetna*, 444 U.S. at 179–80, 100 S.Ct. at 392–93 ("In this case, we hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation.") *Hendler v. United States*, 952 F.2d 1364, 1377 (Fed.Cir.1991). Saratoga lacked the fundamental right to exclude the government from its property at those times when the government could legally impose a conservatorship or receivership on Saratoga. As a consequence of the regulated environment in which Saratoga voluntarily operated, Saratoga and CHS held less than the full bundle of property rights on which a *Loretto* expectation of compensation is founded.

That Saratoga voluntarily subjected itself to an expansive statutory regulatory system when it obtained federal deposit insurance cannot be questioned. It is well known that "[b]anking is one of the longest regulated and most closely supervised of public callings." *Fahey v. Mallonee*, 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947). While it is true that California requires all state-chartered savings and loans to be federally insured, Saratoga's decision to enter the savings and loan business in California was voluntary. Upon so deciding, Saratoga understood, with what may only be viewed as a historically rooted expectation, that the federal government would take possession of its premises and holdings as conservator or receiver if it substantially dissipated its "assets or earnings due to any violation or violations of law or regulations, or to any unsafe or unsound practice or practices[.]" 12 U.S.C. § 1464(d)(6)(A)(ii) (1988) (amended 1989). Saratoga also understood that such an occupation and seizure would not leave Saratoga without rights. Saratoga could have reasonably expected to be able to contest the appointment of the conservator and the receiver in a U.S. district court. 12 U.S.C. § 1464(d)(6)(A)(v) (1988) (amended 1989).

What neither Saratoga nor CHS could have expected was to be compensated for a regulatory possession by OTS and the RTC of its property if that possession were to occur following a determination that Saratoga's financial situation mandated federal conservatorship or receivership.

The changes that occurred in the laws governing federally-insured savings and loan associations between the time Saratoga began operation in 1983 and the time the RTC entered its premises in 1989 also could not have engendered any expectation of compensation for the regulatory actions taken by the government. Conservatorship and receivership under FIRREA differ from conservatorship and receivership under the predecessor statutes more procedurally than substantively. *Compare* 12 U.S.C. § 1464(d)(6)(A) (1988) (repealed 1989) *with* 12 U.S.C. § 1464(d)(2)(C) (Supp. II 1990) (circumstances when conservator and receiver may be appointed substantially similar); 12 U.S.C. § 1729(c)(1)(B)(i)(I) (1988) (repealed 1989) (Federal Home Loan Bank Board may appoint FSLIC conservator or receiver) *with* 12 U.S.C. §§ 1441a(b), 1462a (Supp. II 1990) (OTS may appoint RTC conservator or receiver); 12 U.S.C. § 1729(c)(3)(B) (1988) (repealed 1989) (FSLIC has authority to liquidate institutions or make any other disposition) *with* 12 U.S.C. §§ 1821(d)(2)(G), 1441a(b)(4) (Supp. II 1990) (RTC has authority to merge the institution or transfer any asset or liability). Moreover, the laws governing savings and loan associations have not been static; each of the three statutes involved has been repeatedly amended by Congress since its enactment more than fifty years ago. Given this long history of government regulation of savings and loan associations, CHS and Saratoga were certainly on notice that Saratoga might be subjected to different regulatory burdens over time. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (quoting *Federal Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)) ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end."); *Atlas Corp. v. United States*, 895 F.2d 745, 758 (Fed.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990).

In exchange for the benefit of federal deposit insurance, Saratoga gave the government the right, among other rights, to place Saratoga in conservatorship or receivership when warranted. The conservatorship and receivership actions of OTS and the RTC arose out of this voluntary agreement from which Saratoga benefited for six years. The government's actions cannot now be deemed a taking. *Cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1007, 104 S.Ct. 2862, 2875, 81 L.Ed.2d 815 (1984) ("[A]s long as Monsanto is aware of the conditions under which the data are submitted, and the conditions are rationally related to a legitimate Government interest, a voluntary submission of data by an applicant in exchange for the economic advantages of a registration can hardly be called a taking.").

Finally, the holding of a constitutionally compensable taking in *United States v. Pewee Coal Co., Inc.*, 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951) does not revive CHS's claim for compensation. In *Pewee Coal*, the President issued an Executive Order mandating that the federal government immediately take over operation of coal mines in which a strike or stoppage had occurred or was threatened. *Id.* at 116, 71 S.Ct. at 671. The regulatory scheme that permitted federal occupation of Pewee's coal mine appeared suddenly, at a point in time after Pewee had decided to produce coal. Pewee could fairly expect that it would possess the coal mine undisturbed and that it would be compensated in the event the government took control of the property. Saratoga, unlike Pewee, foresaw the government's occupation of its premises under the circumstances present here when it began operation. Pewee rightly enjoyed a historically rooted expectation of compensation. Saratoga did not.

In short, *Loretto* simply does not fit cases such as this where the historically rooted expectations of ownership that un-

derlie *Loretto* do not exist. Judge Andewelt stated this point well in his *American Continental* opinion disposing of the same *Loretto* taking argument:

> The *Loretto per se* approach should not facilely be extended in cases where the historically rooted expectations that underlie the *Loretto* decision do not remotely apply. The instant case involves a regulatory action in a highly regulated industry in which the government took actions that reasonably should have been expected by plaintiffs and Lincoln.

*American Continental*, 22 Cl.Ct. at 701. The government's occupation and seizure of Saratoga did not constitute a compensable physical taking under the fifth amendment. The judgment of the Claims Court is

AFFIRMED.