MAYER, Circuit Judge,
dissenting-in-part.
In my view, the trial court correctly decided that the water use requirements imposed by the federal government on Ca-sitas do not constitute per se takings of property requiring compensation under the Takings Clause. Because Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002), controls the question of whether the multi-factor inquiry set out in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), is the proper framework for analyzing whether a taking has occurred in this case, I dissent from the majority’s contrary decision.
Casitas does not own the water in question because all water sources within California belong to the public. Cal. Wat.Code §§ 102, 1001. Whether Casitas even has a vested property interest in the use of the water is a threshold issue to be determined under California law. California subjects appropriative water rights licenses to the public trust and reasonable use doctrines, so Casitas likely has no property interest in the water, and therefore no takings claim.[1] Assuming arguendo that there is a property interest in the water, however, the use restriction imposed is pursuant to the administration of the Endangered Species Act (ESA), and is plainly regulatory in nature. Casitas attempts to distinguish restrictions on water use from all other takings jurisprudence, arguing that a partial restriction imposed by law or regulation on an annual water use license triggers a per se rule that a physical taking has occurred. This novel formulation of a per se or categorical takings rule exclusive to water use rights is unsupported by law.
In Tahoe-Sierra, the Supreme Court distinguished between physical takings, in which the government acquires private property for a public purpose, and regulatory takings, in which a law or regulation imposes restrictions on the use of private property “so severe that they are tantamount to a condemnation or appropriation.” 535 U.S. at 321-22 & n. 17, 122 S.Ct. 1465. When the government physi *1298 cally appropriates or occupies private property, the fact that a taking has occurred “is typically obvious and undisputed.” Id. at 322 n. 17, 122 S.Ct. 1465. In contrast, when a law or regulation imposes restrictions on use of the property, courts must engage in “ad hoc, factual inquiries,” focusing on the character of the action and the nature and extent of the intrusion to determine whether the law or regulation has effected a taking. Id. at 326-27, 122 S.Ct. 1465. The Court has consistently explained that “while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.” Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (internal quotation omitted). To determine whether a regulation has gone too far for purposes of the Fifth Amendment, courts analyze the economic impact of the regulation on the claimant and the extent to which the regulation interferes with investment-backed expectations. Penn Central, 438 U.S. at 124, 98 S.Ct. 2646.
When a government statute like the ESA is facially constitutional, the relevant takings question for attendant administrative actions that restrict private property use ascertains the extent to which the government action interferes with the economic use of the property—a classic regulatory, not physical, takings problem. Stearns Co. v. U.S., 396 F.3d 1354, 1357 (Fed.Cir.2005). Two discrete categories of regulatory action, however, are per se compensable under the takings clause without delving into a case-specific analysis: (1) where regulation has compelled an owner to endure a physical invasion of his property, and (2) where regulation deprives an owner of all economically beneficial or productive use of land, examining the parcel as a whole. Lucas, 505 U.S. at 1015, 112 S.Ct. 2886. This case does not involve any sort of physical invasion, does not deprive Casitas of all economically beneficial use of its water license, and Casitas conceded that it can not prevail on the merits of a Penn Central regulatory takings claim.
No physical taking has occurred. First, because Casitas possesses a usufructuary interest in the water and does not actually own the water molecules at issue, it is difficult to imagine how its property interest in the water could be physically invaded or occupied. Cf. United States v. Causby, 328 U.S. 256, 264-66, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (finding a physical taking when the government literally and physically invaded private airspace with its aircraft). Further, the government has not acquired Casitas’ water use license. The United States may not make proprietary use of the water denied to Casitas by the ESA, nor may it divert Casitas’ use rights to a third party. Rather, the limitation imposed on the total quantity of water available for Casitas’ use is directly correlated to the quantity of water needed to remain in the Ventura River’s hydrologic cycle to preserve the endangered Southern California steelhead under a public program to promote the common good. See Tahoe-Sierra, 535 U.S. at 322-23, 122 S.Ct. 1465 (distinguishing between government invasion or acquisition of property, which constitutes a physical taking, and government interference with a private owner’s use of her property, which constitutes a regulatory taking if, after a complex factual assessment, a court determines it goes too far); Penn Central, 438 U.S. at 124, 98 S.Ct. 2646 (“A ‘taking’ may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.”) (internal citation omitted); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 436, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (concluding *1299 that a true physical “occupation is qualitatively more severe than a regulation of the use of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion”).
Nor did the government appropriate the water when it restricted Casitas’ right to make use of it. Am example of a physical taking by government appropriation is the seizure of possession and control of a privately owned coal mine. Compare United States v. Pewee Coal Co., 341 U.S. 114, 116, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (finding a physical taking where the government placed placards reading “United States Property!” on the premises and actually became engaged in the coal mining business), with United States v. Central Eureka Mining Co., 357 U.S. 155, 165-68, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958) (analyzing a wartime Act prohibiting operation of gold mines as a regulatory taking, because “it is clear from the record that the Government did not occupy, use, or in any manner take physical possession of the gold mines or of the equipment connected with them.”). In Tahoe-Sierra, a moratorium on land development did not amount to a physical taking. 535 U.S. at 324-25, 122 S.Ct. 1465 (“This case does not present the classi[c] taking in which the government directly appropriates private property for its own use; instead the interference with property rights arises from some public program adjusting the benefits and burdens of economic life to promote the common good.”) (internal citations and quotations omitted). Similarly, a moratorium on development of a portion of Casitas’ water use rights, imposed while the steelhead trout remains endangered, falls into the category of nonpossessory governmental activity. As long as regulatory restrictions do not require a private property owner to suffer the government’s physical occupation, they should be analyzed “under the multifactor inquiry generally applicable to nonpossessory governmental activity.” Id. at 323-24 & n. 18, 122 S.Ct. 1465; Loretto, 458 U.S at 440, 102 S.Ct. 3164 (citing Penn Central, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)); see also Goodrich v. United States, 434 F.3d 1329, 1333-34 (Fed.Cir. 2006) (affirming the trial court’s characterization of takings claim as regulatory, not physical, for statute of limitations purposes, when Forest Service restricted private rancher’s water rights on federally-owned grazing land).
In distinguishing between physical and regulatory takings claims, Tahoe-Sierra neither overruled nor contradicted the Du-gan, Gerlach and International Paper line of takings cases, all of which involved physical takings. In each of those cases, the government appropriated a private party’s water right by requisitioning the water for its own or a third party’s proprietary and consumptive use. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (finding a physical taking where the U.S. appropriated downstream riparian land owners’ water rights by damming a river upstream, storing the water and diverting it to irrigation and utility projects); United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) (finding a physical taking where the U.S. appropriated downstream riparian land owners’ water rights by capturing, storing and diverting water from two California rivers for sale to private energy and irrigation interests); Int’l Paper Co. v. United States, 282 U.S. 399, 51 S.Ct. 176, 75 L.Ed. 410 (1931) (finding a physical taking where the U.S. cut off International Paper’s water rights and conferred them on Niagara Power Company to use for the wartime production and sale of electrical power).
*1300 Here, the government did not invade, seize, convey or convert Casitas’ property to consumptive or proprietary use. Rather, it imposed regulatory operating criteria on Casitas’ request to comply with the ESA through use of a fish passage facility that returns a specified amount of water diverted from the Ventura River by the Robles Diversion Dam back to its natural flow for the purpose of endangered species preservation. Mere deprivation of water from the owner of water rights without governmental invasion, appropriation or diversion of the water for consumptive or proprietary use does not amount to a physical taking under Tahoe-Sierra. The government’s action restricting Casitas’ right to make consumptive use of a portion of the water granted by its license is not possessory. See Loretto, 458 U.S. at 440, 102 S.Ct. 3164 (stating that the multifactor Penn Central inquiry is generally applicable to nonpossessory governmental activity). Rather, a classic regulatory restraint on natural resource development has occurred. See Steams, 396 F.3d at 1357 (concluding that the Surface Mining Control and Reclamation Act’s restrictions on a mineral estate owner’s access to its mineral property and easement did not constitute a physical taking, that physical takings require physical possession or occupation, and that the property holder’s “argument to the contrary is little more than an incredible attempt to transform a regulatory taking claim into a per se physical taking”); Seiber v. United States, 364 F.3d 1356, 1366 (Fed.Cir.2004) (“regulatory restrictions on the use of property do not constitute physical takings”); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347, 1354 (Fed.Cir.2002) (logging restriction imposed and later lifted on privately owned land to protect threatened species under the ESA would be analyzed as a Penn Central regulatory takings claim if case not barred by ripeness doctrine) (citing Tahoe-Sierra, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002)).
For this to be a physical taking requires expanding the definition to the point of erasing the line between physical and regulatory takings. Indeed, any property use restriction—whether on land, air, or water, and whether temporary or permanent—deprives the owner of a pre-existing right to develop at least a portion of his property for certain economic uses. Yet in Tahoe-Sierra, the Supreme Court nevertheless reaffirmed the constitutional distinction between physical acquisitions and regulatory restrictions. 535 U.S. at 321-22, 122 S.Ct. 1465. Here, compliance with Section 9 of the ESA ultimately requires Casitas to leave more water in the river, thus augmenting the downstream river flow essential for protection of the endangered steelhead trout. In cooperation with the Bureau of Reclamation, Casitas can presumably accomplish this in any number of ways; for example, by closing the Robles-Casitas Canal entrance gates and allowing fish passage through openings in the Robles Diversion Dam, or by permitting some of the water diverted by the dam to return to the river through a fish passage facility. To differentiate between these two illustrative approaches on a deceptively simple theory of “diversion” creates a perverse system of incentives, whereby form is elevated over substance, because self-selected methods of regulatory compliance can be manipulated and negotiated to arrive at preferred Fifth Amendment results. According to this pretextual logic, in the first example, water never leaves the river’s flow, so there is no “diversion.” In the second example, Casitas allows some already diverted water to return to the river, creating a “re-diversion.” The result is the same, and should not lead to a difference in the characterization of the activity: a private property owner’s choice of prophylactic actions *1301 cannot dictate whether a future takings claim will be physical or regulatory. This is particularly salient because it was Casi-tas who initiated Reclamation’s Section 7 ESA consultations with the National Marine Fisheries Service and suggested use of the fish passage facility to ensure ESA compliance. Presumably, this approach represented the most economical way to comply with the ESA while still permitting Casitas to divert its maximum allowable allotment of water.
In sum, governmental deprivation of some water use rights absent the government’s active or appropriative hand in diverting water for its own or a third party’s consumptive or proprietary use does not amount to a physical taking. The only case holding to the contrary is Tulare Lake Basin Water Storage District v. United States, 49 Fed.Cl. 313 (2001), which its author expressly disclaimed in the present case in light of the intervening Tahoe-Sierra case. Casitas Mun. Water Disk v. US., 76 Fed.Cl. 100, 106 (2007) (“Tahoe-Sierra ... compels us to respect the distinction between a government takeover of property (either by physical invasion or by directing the property’s use to its own needs) and government restraints on an owner’s use of that property.”). Casitas has been restrained from making full use of its California water license under certain circumstances related to the endangerment of the steelhead trout. When the government requires a usufructuary holder of water rights to allow a specified amount of dam-diverted water to circle back to its natural flow by way of a fish ladder for the purpose of endangered species preservation, a classic regulatory restriction on private property rights to prevent a public harm has occurred. It is logically incongruent to analyze ESA-based land use restrictions as regulatory takings, and ESA-based water use restrictions as physical takings. The government is not appropriating or taking possession of Casitas’ property, but rather is prohibiting Casitas from making private use of a certain amount of the river’s natural flow under a public program to promote the common good. Labeling such an action a physical taking blurs the line Tahoe-Sierra carefully draws between physical and regulatory takings.

. The government confined any assumption to the contrary to its summary judgment motion, so the property interest issue would be subject to consideration on remand.