**Morris ARTHUR, Appellant,**

v.

**DISTRICT OF COLUMBIA,
et al., Appellees.**

**Nos. 00–CV–1389, 00–CV–1413.**

District of Columbia Court of Appeals.

Argued May 26, 2004.
Decided Sept. 9, 2004.

Donna M. Murasky, Assistant Attorney General and Senior Litigation Counsel and Marc B. Tucker, with whom Robert J. Spagnoletti, Attorney General, Edward E. Schwab, Deputy Attorney General, Appellate Division, and Jennifer Ancona Semko, were on the brief, for appellees.[1]

Bernard A. Nigro, Jr. filed a brief in behalf of amici curiae: The Washington Council of Lawyers, AYUDA, Inc., Consortium of Legal Services Providers, Council of Latino Agencies, Partnership for Civil Justice, and Public Citizen Litigation Group.

Before SCHWELB, RUIZ and REID, Associate Judges.

REID, Associate J.

This case involves very contentious, labyrinthine litigation relating not only to marital property belonging to appellant Morris Arthur and his wife, Christine Arthur, but also to questions pertaining to interest on sums of money deposited initially in the court registry but later transferred to the District of Columbia Treasurer. Specifically, the issues presented in this appeal concern the trial court's decision to vacate the entry of default against Ms. Arthur in one aspect of the litigation, the relative equities of Mr. and Ms. Arthur in their marital property, and the interest earned, if any, on the principal sums paid into the court registry in this case. Because the trial court did not address or decide questions essential to appellate resolution, we vacate the trial court's judgment and remand the case to the trial court with instructions to address and resolve three matters consistently with this

Barbara McDowell, Legal Aid Society, with whom Rochanda F. Hiligh, Neighborhood Legal Services Program, was on the brief, for appellant.

---

1. On the day of oral argument in this case, the Mayor of the District of Columbia issued an order changing the name of the Office of Corporation Counsel to the Office of the Attorney General for the District of Columbia. *See* Mayor's Order 2004–92, (May 26, 2004).

The following day the Office of the Attorney General for the District of Columbia promulgated an office order changing the titles of attorneys and deputies. *See* Office of the Attorney General, Office Order No.2004–28, (May 27, 2004).

opinion: (1) the reason for its decision to vacate the entry of default against Ms. Arthur; (2) the question of ownership of the $14,500.00 principal paid into the court registry, and whether Mr. and Mrs. Arthur have consented to a partition of their marital property which they acquired as tenants by the entireties and if they have consented, their relative equities in the property; and (3) the determination of how much interest, if any, was earned on the $14,500.00 principal sum and the court-ordered $350.00 security deposited in the court registry and later transferred to the District's general fund; and whether the District had a fiduciary duty to see that interest was earned and computed. Furthermore, we hold that any interest earned or which should have been earned on the sums deposited in the court registry and later transferred to the District's general fund belonged to Mr. or Ms. Arthur, or both, and that the District's retention of such interest constituted a taking for public use under the Fifth Amendment to the Constitution of the United States; such taking may or may not require just compensation, depending on the net loss suffered by the owner(s) of the deposited funds.

## FACTUAL SUMMARY

The record shows that this matter has been in the courts since 1980 and has had a complicated procedural history, including a period of dormancy from around 1982 to 1996, traceable in part to Mr. Arthur's incarceration from about 1985 to 1996.

The case commenced on July 7, 1980, when Mr. Arthur filed a complaint for injunction against a foreclosure sale of the Arthurs' marital property (held under a tenancy by the entireties), located in the 2600 block of Tenth Street, in the Northeast quadrant of the District of Columbia. The complaint against Irving Kamins and others alleged that Ms. Arthur's "whereabouts is presently unknown," and that Mr. Kamins had served Mr. Arthur with a foreclosure notice due to failure to pay a promissory loan note of $14,500.00. Since he had not been informed of the loan and the signature on the loan documents was not his, Mr. Arthur sought a judgment declaring the note and the accompanying deed of trust null and void due to forgery.[2] He also requested a temporary restraining order, as well as a preliminary injunction, both of which were granted.[3] However, the Honorable Paul R. Webber, III ordered him to "deposit additional security of $650 cash into the registry of the Court, in monthly installments of $65 each by the 10th day of each month commencing October 10, 1980."[4]

When Mr. Arthur was unable to meet monthly mortgage payments on the marital property, he and Mr. Kamins reached an agreement to avoid foreclosure. To reflect their agreement, they filed a stipulation in the trial court on February 9, 1981, designed "to permit the sale of the property. . . ." "[T]he sum of $14,500.00 of the gross proceeds of [the] sale [of the marital property] [was] place[d] ... into the Registry of the Court, to be held pend-

2. Later, it was revealed that Mr. Arthur's brother had signed Mr. Arthur's name to the loan documents, with Ms. Arthur's knowledge, because the Arthurs were experiencing severe marital problems, including domestic violence by Mr. Arthur.

3. The order granting the preliminary injunction was filed on September 10, 1980, after an evidentiary hearing during which Mr. Arthur

testified that he did not sign the loan documents, and that "when he awoke on May 1, 1980 'the house was empty'; his family had gone."

4. Mr. Arthur was unable to pay the amount ordered, but earlier, on August 12, 1980, had paid $350 into the court registry as security.

ing final disposition of this suit." The stipulation required whatever sum remained after the "satisfaction of the note" to be "disburse[d] ... to [Mr. and Ms.] Arthur ... in accordance with their equities in [the marital property]." Ms. Arthur was not a party to the stipulation.

In light of the stipulation and the deposited funds, however, Ms. Arthur was a necessary party. *See* Super. Ct. Civ. R. 19(b).[5] Hence, on September 16, 1982, the trial court, the Honorable Joseph M. Hannon, "removed [the case of *Morris Arthur v. Irving Kamins, et al.*] from the trial calendar" and ordered Mr. Arthur's counsel to make Ms. Arthur a party to his lawsuit, and to serve her with a copy of the complaint within 30 days. In response to Mr. Arthur's motion, the time to serve Ms. Arthur was extended to November 15, 1982.[6] At this point, the case became dormant since Ms. Arthur was not served and the case was not restored to the calendar.

On February 17, 1988, the civil finance office of the Superior Court of the District of Columbia sent a check to the D.C. Treasurer in the amount of $14,850.00.[7] A praecipe noted, "Unclaimed deposits over 3 years old." Consequently no funds pertaining to this case remained in the court registry. There is no indication in the record that the parties were notified about the transfer of the deposit from the court registry to the D.C. Treasurer.

The case was lifted from its dormancy when Abraham Zaiderman, successor in interest to Mr. Kamins, duly moved on July 30, 1995, to restore the case to the active docket. He indicated that he would take steps to locate Mr. and Mrs. Arthur, and would "request that funds released from the court registry be restored...." The court granted the motion on August 29, 1995. Thereafter, in mid-October 1995, Mr. Zaiderman filed two motions, one to join the District of Columbia as a party or third party plaintiff, and the other to restore the $14,850.00 to the court registry. On December 22, 1995, the District responded, asserting that the funds should be deemed abandoned under the [District of Columbia] Disposition of Unclaimed Property Act, D.C.Code §§ 42–201 *et seq.* (1990). The Honorable Stephen Milliken denied Mr. Zaiderman's motion relating to the restoration of the $14,850.00 to the court registry and granted the sum to the District as abandoned property.

In addition to his effort to restore the funds to the court registry, Mr. Zaiderman filed a counterclaim against Mr. Arthur on August 31, 1996, seeking to have disbursed to him (that is, to Mr. Zaiderman) "$14,500.00 plus interest from March 10, 1980, to date of the entry of judgment at the rate provided for in the [promissory loan] Note." He also moved to add Ms. Arthur's name as a party plaintiff; this motion was granted on September 23, 1996.

New attorneys for Mr. Arthur entered their appearance on March 12, 1997, and filed motions designed to secure for Mr. Arthur all the funds originally placed in the court registry, and interest thereon. For example, on August 6, 1997, Mr. Arthur filed a motion for "summary judg-

---

**5.** The trial court considered her an indispensable party.

**6.** In his November 5, 1982 motion to extend time to serve Ms. Arthur, Mr. Arthur's counsel averred that he had "only learned [Ms. Arthur's] address [in Philadelphia] on October 29, 1982," and that a summons and com-

plaint had been sent to her on November 1, 1982 by certified mail.

**7.** The $14,850.00 included the $14,500.00 deposited after the sale of the property, and the $350.00 which the trial court ordered Mr. Arthur to pay into the court registry on August 12, 1980.

ment against the District of Columbia on any claim it may have as a third-party defendant to the $14,850.00 paid into the court registry in this matter and to the interest earned (approximately $8,000.00 to date) on that sum since February 17, 1988."[8] The motions were intended to establish that neither Ms. Arthur, Mr. Zaiderman, nor the District had any right to those funds or the interest that Mr. Arthur alleged should have accumulated through the years, and that such interest properly belonged to him. In 1998, the Honorable Shellie Bowers entered a "default judgment" against Ms. Arthur, subject to review by the trial judge scheduled to take over the later stage of the case, the Honorable Gregory Mize. When Judge Mize assumed responsibility for the case, he scheduled a jury trial that took place from July 24–26, 2000. After hearing testimony from several individuals at the trial, including former counsel for Mr. Arthur, Ms. Arthur, and her mother, the court resolved all of the issues as a matter of law, and dismissed the jury. An order summarizing its oral rulings was signed on July 27, 2000, and docketed on August 10, 2000. The trial court concluded that Mr. Zaiderman "is entitled to nothing" "as a matter of law," and that Mr. Arthur and Ms. Arthur "are entitled to $14,500.00 as tenants by the entireties." The trial court also vacated the entry of default against Ms. Arthur "on [Mr.] Arthur's cross[-]claim against her ... because it is contrary to established D.C. statutes and case law," and hence the court denied Mr. Arthur's cross[-]claim "as [a] matter of law." Subsequently, on October 17, 2000, the court docketed an order denying pre-judgment interest on both the $350.00 sum

paid into the court registry by Mr. Arthur, and the $14,500.00, because "there is no legal basis for interest to accrue in [Mr. Arthur's] favor on [these sums]." Mr. Arthur filed timely notices of appeal.

## ANALYSIS

This appeal requires us to focus on three matters: (1) the trial court's decision to vacate the default judgment against Ms. Arthur; (2) the ownership of the $14,500.00 in proceeds from the marital property of Mr. and Ms. Arthur; and (3) interest on the sums deposited in the court registry and later transferred to the District's general fund. We turn first to the entry of default issue.

### Entry of Default

We begin by providing a factual context for our analysis. On April 17, 1997, some seventeen years after his complaint initiating this case was filed, Mr. Arthur lodged a motion for leave to file a cross-claim against Ms. Arthur, who had been added as a co-plaintiff, and whose time for entering an appearance in the case had been extended to April 27, 1997. Mr. Arthur's cross-claim sought a judgment declaring that Ms. Arthur's actions in arranging for someone else to sign his name on the $14,500.00 loan note and deed of trust "w[ere] fraudulent and inequitable and did not entitle her to any portion of the $14,500 paid into the court registry." Simultaneously, Mr. Arthur requested "entry of default judgment" against Ms. Arthur on his cross-claim. He based his request upon Ms. Arthur's failure to enter an appearance and to file an answer after she was added as a co-plaintiff. As he put it: "The Order of Publication in this case

---

8. The proposed order attached to the motion contained proposed conclusions of law. Paragraph 4 of those conclusions quoted from a Supreme Court decision pertaining to the Fifth Amendment's guarantee against "a

forced contribution to general government revenues." *Webb's Fabulous Pharms. v. Beckwith*, 449 U.S. 155, 163, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980).

plainly placed Ms. Arthur on notice that any claim she has to the $14,500 in the court registry will be extinguished if she does not cause her appearance to be entered." Citing Super. Ct. Civ. R. 55(b)(2), he further asserted that: "An application for judgment by default need not be served on Ms. Arthur, because she did not respond to the Order of Publication."

During a November 14, 1997, hearing before Judge Bowers, Mr. Arthur's motion for leave to file the cross-claim and for entry of default judgment was discussed. Judge Bowers reported that his chambers received a telephone call from Ms. Arthur advising that she was in South Carolina and would not be in court. Mr. Arthur's counsel reported that he had spoken with Ms. Arthur who "indicated in communications to [him] that she does not plan to become involved because she faces criminal liability for forgery if she does and that she has elected all along not to get involved for that reason." The trial court granted Mr. Arthur's motion for leave to file the amended cross-claim reflecting this information.

At a hearing on May 29, 1998, Judge Bowers declared that he had entered a "default judgment" against Ms. Arthur on April 27, 1998. Those present claimed that they did not receive the order. Subsequently, during a hearing on July 31, 1998, the parties informed Judge Bowers that they did not receive the order entering judgment of default against Ms. Arthur on Mr. Arthur's amended cross-claim.

Judge Bowers responded that the order had been entered because there was a reference to it in another order granting Mr. Arthur's motion to strike Mr. Zaiderman's amended counterclaim against Ms. Arthur. That order stated in relevant part:

> In view of the default judgment rendered against her on this date, Christine Arthur no longer has any interest in the registry funds which could be subject to any counterclaim. This default judgment was based not upon any alleged ruling from the bench on December 19, 1997, but from the fact that, as of April 27, 1998, she'd filed no responsive pleading to the amended cross[-]claim of [plaintiff], Morris Arthur, which was served on her on November 31, 1997[sic].

After the court finished reading the docket entry, counsel for the District asserted: "Ms. Arthur has testified under oath that she can't come forward because she's been threatened by Mr. Arthur . . . ." When the trial court reiterated its view that Ms. Arthur had filed no pleading since being served in November 1997, counsel for the District referenced filings then recently made, and mentioned Ms. Arthur's "fear for her life," Mr. Arthur's alleged attacks on Ms. Arthur, and his incarceration "for 11 years for assault with intent to kill."[9] Upon further discussion at the July 31, 1998 hearing, relative to the reasons why Ms. Arthur had not filed a re-

---

9. On June 8, 1998, counsel for Mr. Zaiderman took the sworn deposition of Ms. Arthur. She stated that she took her children and left Mr. Arthur in 1980. She "feared for [her] life because [Mr. Arthur] told [her] if [she] ever left and took the kids . . . he would kill [her]." Although she was reluctant to discuss her relationship with Mr. Arthur, she related that on one occasion Mr. Arthur "kicked [her] in [her] back, and [she] had to go to the hospital . . . and . . . [her] arm was put in a sling."

Because of their children, at least four of whom resided with Ms. Arthur during the early period of this litigation, Mr. Arthur remained in contact with them after Ms. Arthur left their home. Although Mr. Arthur was in prison from about 1985 to 1996, when he was released, Ms. Arthur was present when he "stop[ped] by to see [his] son and his granddaughter" approximately three times around 1980, but did not discuss the litigation.

sponsive pleading once she was added as a co-plaintiff, the trial court commented that it would sign the order entering "default judgment" and "indicating [Ms. Arthur] has no interest, but ... [would] put a footnote on [the order]" to show that "[t]his is all subject to reconsideration ... once [the court] hear[s] ... [further] evidence...." The trial court then signed an order, dated July 31, 1998, "nunc pro tunc to April 27, 1998." In the final paragraph of its order, the trial court declared:

> FURTHER ORDERED, that a default judgment is entered on this Cross–Complaint against [Ms.] Arthur, and in favor of [Mr.] Arthur, DECLARING:

> [Ms.] Arthur has no equity in the $14,500 paid into the court registry as against plaintiff [Mr.] Arthur. First American Insurance Company (successor in interest to Columbia Real Estate Title Insurance Company, which succeeded to the interest of Washington Title & Abstract Corporation) is so instructed, in accordance with the "Stipulation" filed with this court on or about February 9, 1981.[10]

The trial court added a footnote to its order which reads: "This default judgment against [Ms.] Arthur on [Mr.] Arthur's Amended Cross–Complaint will be revisited and reconsidered following the hearing and resolution of [Mr.] Zaiderman's recently filed Motion to Vacate Summary Judgment Order of September 27, 1997 and to Restore Case to Trial Docket."[11]

Judge Bowers held a hearing on October 29, 1998, on Mr. Zaiderman's motion to vacate the summary judgment that had been entered in favor of Mr. Arthur on Mr. Zaiderman's forgery claim. Ms. Arthur testified at the hearing. The trial court denied Mr. Zaiderman's motion to vacate summary judgment.

With respect to the previously entered default judgment against Ms. Arthur, the trial court noted that "not one question was ever put to [Ms. Arthur at the October 29, 1998 hearing,] about why she didn't file an opposition after being served" on November 21, 1997, or "why she didn't look for a lawyer after being served with [Mr. Arthur's] amended complaint" against her. Mr. Zaiderman's counsel pointed out that the cross-claim was not before the court and that Ms. Arthur was not represented by counsel. Eventually, the trial court gave Ms. Arthur until November 30, 1998, to seek leave for a late response to "the papers on the amended cross[-]claim ... of [Mr.] Arthur."

The next hearing took place on December 10, 1998, in the presence of counsel for Mr. Arthur, Mr. Zaiderman, and the District. Ms. Arthur was present, without counsel. Judge Bowers inquired as to whether Ms. Arthur had obtained counsel. She responded, "no" and requested that the trial court provide counsel. The trial

---

10. In the first part of its July 31, 1998 order, the trial court found that "[t]he Amended Cross–Complaint was personally served on [Ms. Arthur] on November 21, 1997," and "[m]ore than twenty days have passed and Ms. Arthur has filed no response to the Amended Cross–Complaint." The court further ordered that "the allegations in paragraph 1–8 of the Amended Cross–Complaint [detailing Ms. Arthur's alleged fraud with respect to the promissory loan note] are taken as true."

11. The record contains a motion by Mr. Zaiderman, dated July 21, 1998, and styled: "Motion to Vacate Summary Judgment Order of October 27, 1997 and Restore Case to Trial Docket for Determination of Merits." The motion "urg[ed] the court to vacate the summary judgment entered October 27, 1997 in favor of [Mr.] Arthur on his claim of forgery of the Note of March 10, 1980 [the note concerning the $14,500 loan obtained by Ms. Arthur]."

court explained, "in civil cases we don't appoint lawyers to represent civil litigants." Ms. Arthur then requested additional time to file an answer, saying that she planned to meet with a lawyer that afternoon. The court admonished Ms. Arthur that she had already been given extended time to respond to the amended cross-claim, and added: "You have not met the deadline, the November 30th deadline, so you may file whatever you wish to file and the court will deal with it accordingly."[12]

As the trial court listened further to the arguments of counsel and Ms. Arthur, particularly about allegations of "fraud" or "forgery" by Mr. Arthur concerning the signing of the deed that led to the sale of the marital property pursuant to the stipulation with Mr. Kamins, the trial judge expressed concern. He revealed that he had given some thought to "setting aside" the "default judgment" against Ms. Arthur and letting the case proceed to trial. But toward the end of the hearing the trial court stated:

> Now, Ms. Christine Arthur may file whatever she wishes. The deadline for filing was November 30th[, 1998] for her[, i]f she wanted to file anything, such as ... a motion to vacate the default against her for failing to respond to the cross[-]claim.
>
> But whatever she wishes to file, she may still file it but it's now out of time. And the Court, whoever rules on it, will have to deal with that if it's brought up

as an issue. The deadline was November 30, but that doesn't mean she can't file. She may still file with or without a lawyer.

Judge Bowers also observed that the next trial judge assigned to the case, Judge Mize, "may vacate out ... my rulings, it's up to him."

Because he had given additional thought to the case, Judge Bowers called the parties together on December 18, 1998. Without making findings, the trial court reported its understanding that "[t]here are two separate issues of fraud being raised...." One related to the allegation that Mr. Arthur "forged the deed [for the sale of the Arthurs' marital home] which led to the funds which are now ... in the custody of the District...." The other fraud issue pertained to the allegation that Mr. Arthur "knew where his wife was all of this time and for all of these years.... and was purposely keeping her away from the case." Judge Bowers confirmed his decision to grant the motion for "default judgment" against Ms. Arthur:

> When [Ms. Arthur] came in here and sort of resurfaced and I gave her some more time, the default had not been set aside. What I was giving her more time to do was to file a motion to set aside the default. And she didn't do that. So, that default is still out there against her.[13]

On May 18, 1999, and pursuant to Super. Ct. Civ. R. 55 and R. 60, counsel for Ms.

12. The December 10, 1998 hearing was a contentious one during which the trial court repeatedly instructed counsel for Mr. Zaiderman and the District that they could not represent Ms. Arthur. Mr. Zaiderman's attorney pressed the court to appoint counsel for Ms. Arthur, and the District's counsel had assisted her by adding a certificate of service page and filing a motion for Ms. Arthur requesting additional time to obtain counsel. Ms. Arthur remarked that because she lived in South

Carolina and had no job, it was difficult to find counsel in the District.

13. The trial court appeared to take the position that although a "default judgment" had been entered against Ms. Arthur, she might remain in the case with respect to the alleged fraud of Mr. Arthur pertaining to the sale of the marital home, and the distribution of the $14,500 resulting from the sale.

Arthur filed a "motion to vacate the prior order of default entered against her" in 1998, "and to dismiss [Mr.] Arthur's cross[-]claim against her...." Ms. Arthur declared that under Super. Ct. Civ. R. 55(c), the trial court "is authorized ... to set aside the default previously entered without filing a verified answer to [Mr.] Arthur's cross[-]claim upon taking judicial notice of the Stipulation of February 9, 1981." She argued, "that stipulation operates as a settlement to govern the adjudication of the rights of [Mr.] Arthur and [Ms.] Arthur in respect of their interests, one to the other, in the funds held in the Court registry." She also claimed that Mr. Arthur had kept knowledge of the pending litigation from her during the period 1980 to 1998.[14] And, she cited her difficulty obtaining counsel, her request for counsel and her prior testimony in the case as evidence of her intent to put up a defense.

The case proceeded to trial and during his explanation to the jury about the issues to be considered at the July 2000 trial, Judge Mize remarked: "[Ms.] Arthur, who was called into the case in 1982, was found by the court at a prior time to have no equity in the $14,500." As the case unfolded, Ms. Arthur and her mother were called as witnesses in behalf of Mr. Zaiderman. While Ms. Arthur's mother, Nellie M. Gibson, who resides in Philadelphia, was giving testimony, an objection arose which led Judge Mize to review Judge Bowers' July 31, 1998 order indicating that Ms. Arthur has no equity in the $14,500.00 at issue in the case. After reviewing the order, Judge Mize allowed Ms. Gibson to testify that while her daughter and her children were staying with her in Philadelphia, Mr. Arthur found out in December 1980 that

she was there, and journeyed to Philadelphia.

Ms. Arthur followed her mother on the witness stand. At the time of her testimony, she resided in Latta, South Carolina. As she began to respond to certain questions and objections were raised, the trial judge inquired: "[H]asn't [Ms.] Arthur failed to do some significant things, and thereby placed herself in a defaulting or disqualifying mode as to the money? I mean, the order of July '98 would not have been issued, perhaps, if Ms. Arthur had asserted something, but she didn't." When Ms. Arthur resumed her testimony on July 26, 2000, she revealed that she did not ask Mr. Arthur to co-sign the $14,500.00 loan note because of her "fear of physical violence ...[and because she] was afraid of him." She detailed her fear by citing examples:

> Well, I was afraid because once I had to go to Providence Hospital where he had kicked me in my back and I had a nervous condition with my arm, and there had been different— several times, once I was pregnant and he had choked me, and I fainted. I went out.

She left the marital home in May 1980, stayed with a friend for a week and then went to Philadelphia to stay with her parents. After she moved in with her parents, she communicated with Mr. Arthur "[b]ecause [their] kids wanted to see him." Mr. Arthur visited them in December 1980, but she was unable to contact him "[f]rom 1989 until 1996" since he was in prison.

Ms. Arthur said she first heard about the litigation before the court in 1996 or 1997 "when [she] moved to South Carolina." She was not aware that her marital home had been sold until then; she

14. Although Ms. Arthur "was served with [Mr. Arthur's cross-claim] ... in November 1997, it ... was woefully deficient to demonstrate to her that she had any stake in any funds which had been paid into the Court registry nearly 17 years earlier."

thought the mortgage company had foreclosed on the property. After Ms. Arthur became aware that the home had been sold, her husband instructed her to "stay out of [the matter]," that he "was going to handle it." Ms. Arthur acknowledged that counsel for Mr. Arthur had sent her a letter in November 1997, explaining the $14,500.00 sum and advising her to retain counsel. She also confirmed that she had sent a letter to Mr. Arthur's counsel indicating that she "did not have any interest in seeking the money." The trial court gave Ms. Arthur the opportunity to provide testimony as a party. In the course of that testimony, she stated that when Mr. Arthur's counsel called her, he told her that the $14,500.00 was not hers, "that it was [her] husband's money...."

On the afternoon of July 26, the trial court resolved the outstanding issues in the case as a matter of law, and dismissed the jury. Counsel for Mr. Arthur twice protested the trial court's decision to reverse Judge Bowers' order of July 31, 1998, as it related to Ms. Arthur. He said: "She failed to file an answer, we got a default on that issue, and there has been adjudication that she has no equity in those funds, and it all goes to Mr. Arthur." The trial judge did not address the default issue at this point. A little later in the discussion with the trial judge, counsel for Mr. Arthur argued that Ms. Arthur "raised absolutely no defense, a year passed, default was entered against her." The trial court concluded that because the $14,500.00 in the court registry "must be released to [Mr. and Ms. Arthur] as tenants by the entirety," "plainly there is nothing left to decide," and did not respond to counsel's arguments concerning the entry of the default judgment. And, in its written order summarizing its oral rulings, the trial court stated only: "The order of July 31, 1998 entering a default judgment against [Ms.] Arthur on [Mr.]

Arthur's cross[-]claim against her was vacated because it is contrary to established D.C. statutes and case law."

We turn now to the provisions governing our resolution of the "default judgment" issue. Preliminarily, the trial court correctly concluded that it had authority to revisit Judge Bowers' order declaring that Ms. Arthur had no equity in the $14,500.00. " 'Judges are constantly reexamining their prior rulings in a case on the basis of new information or argument or just fresh thoughts....' " *Blyther v. Chesapeake & Potomac Tel. Co.*, 661 A.2d 658, 662 (D.C.1995) (quoting *Johnson v. Burken*, 930 F.2d 1202, 1207 (7th Cir.1991)) (Ruiz, J., concurring). Since the order entering "default judgment" against Ms. Arthur did not adjudicate all the claims or rights and liabilities of the parties, it was proper for Judge Mize to revisit and to revise that order. The central problem, here, however, is that Judge Mize did not indicate his reasons for vacating the April/July 1998 order against Ms. Arthur.

■ In her motion to vacate the default and dismiss Mr. Arthur's cross-claim, Ms. Arthur cited Super. Ct. Civ. R. 55 and 60 as the authority for her motion. Super. Ct. Civ. R. 55(a) concerns entry of default whereas Rule 55(b) pertains to entry of default judgment. We have distinguished previously between the entry of default and a default judgment. "In general, the entry of default does not constitute a judgment, but simply precludes the defaulting party from offering any further defense on the issue of liability." *Lockhart v. Cade*, 728 A.2d 65, 68 (D.C.1999) (citing *Clark v. Moler*, 418 A.2d 1039, 1042 (D.C.1980) (other citation omitted)); *Miranda v. Contreras*, 754 A.2d 277, 280 n. 4 (D.C. 2000). "An entry of default is simply an interlocutory order, whereas a default judgment 'is a final judgment that termi-

nates the litigation and decides the dispute.'" *Lockhart, supra* at 68 (quoting *Clark, supra* at 1042); *see also Restaurant Equip. & Supply Depot, Inc. v. Gutierrez*, 852 A.2d 951, 956 (D.C.2004); *Digital Broad. Corp. v. Rosenman & Colin, L.L.P.*, 847 A.2d 384, 387 n. 5 (D.C.2004). Whereas Rule 55(c) provides for setting aside a default, *see generally* 10 JAMES WM. ET. AL., MOORE'S FEDERAL PRACTICE, § 55 (3d ed.2004); 10A CHARLES ALAN WRIGHT, ET. AL., FEDERAL PRACTICE AND PROCEDURE, § 2681 *et seq.*, (1998), Super. Ct. Civ. R. 60(b) governs setting aside a default judgment.

■ Here, Judge Bowers styled his July 31, 1998 order as a "default judgment" against Ms. Arthur, but it is clear that it is not a "final judgment that terminates the litigation [against Ms. Arthur] and decides the dispute." *Lockhart, supra* at 68 (quoting *Clark, supra* at 1042). This is so because, despite the finding that the allegations of Mr. Arthur's amended cross-complaint that allege forgery by Ms. Arthur are taken as true, footnote 1 of that order precludes finality. As Judge Bowers noted: "This default judgment against [Ms.] Arthur on [Mr.] Arthur's Amended Cross–Complaint will be revisited and reconsidered following the hearing and resolution of [Mr.] Zaiderman's recently-filed Motion to Vacate Summary Judgment Order of September 27, 1997 and to Restore the Case to Trial Docket." Thus, the order of July 31, 1998 is appropriately considered as an order entering default under Super. Ct. Civ. R. 55(a), and one to be revisited.[15]

■ Since the July 31, 1998 order reflects the entry of default against Ms. Arthur, the standard for setting it aside is found in Super. Ct. Civ. R. 55(c) which states:

> (c) Setting aside default. For good cause shown, and upon the filing of a verified answer setting up a defense sufficient if proved to bar the claim in whole or in part, the Court may set aside an entry of default. No answer need be filed if the movant accompanies the motion with a settlement agreement or a proposed consent judgment signed by both parties. In addition, an answer shall not be required when the movant asserts a lack of subject-matter or personal jurisdiction or when the default was entered after the movant had filed an answer.

Rule 55(c) requires a showing of good cause before a default may be set aside. A second requirement is the filing of a verified answer, unless (1) the motion to vacate the default is accompanied by "a settlement agreement or a proposed consent judgment signed by both parties"; or (2) there is an assertion that the court lacks subject-matter or personal jurisdiction; or (3) "the default was entered after the movant had filed an answer." *See Clark, supra*, 418 A.2d at 1041 n. 4. Moreover, the

---

**15.** Super. Ct. Civ. R. 55(a) provides in pertinent part:

> (a) *Entry*. When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these Rules, the Clerk or the Court shall enter the party's default. Any order of default entered *sua sponte*, including a default for failure to respond to the complaint within the time prescribed in Rule 12(a), shall not take effect until fourteen (14) days after the date on which it is docketed and shall be vacated upon the granting of a motion filed by defendant within such 14 day period showing good cause why the default should not be entered....

Super. Ct. Civ. R. 12(a) does not apply here since Judge Bowers extended the time for Ms. Arthur to respond to Mr. Arthur's amended cross-claim on more than one occasion. *See Restaurant Equip. & Supply Depot, Inc., supra*, at 955 nn. 2, 3

decision whether to vacate the entry of default is committed to the sound discretion of the trial court. *See Rubin v. Lee,* 577 A.2d 1158, 1160 (D.C.1990) (citing *Firemen's Ins. Co. of Washington, D.C. v. Belts,* 455 A.2d 908, 909 (D.C.1983)); *see also Restaurant Equip. & Supply Depot, Inc., supra,* 852 A.2d at 956. "In exercising its discretion, the trial court must choose what is right and equitable under the circumstances and the law and state the reasons which support its conclusion." *Rubin, supra,* 577 A.2d at 1160 (citing *Johnson v. United States,* 398 A.2d 354, 361–64 (D.C.1979)) (internal quotation marks omitted).

■ Here, on this record, the trial court's reasons for vacating the default against Ms. Arthur are not articulated clearly. More is needed than a statement that the entry of default "is contrary to established D.C. statutes and case law," especially in light of the requirements set forth in Super. Ct. Civ. R. 55(c). Therefore, we are constrained to remand this matter to the trial court for a statement of reasons supporting its decision to vacate the default against Ms. Arthur. First, the trial court must address whether "good cause [has been] shown" to justify vacating the default. In that regard, the trial court may consider whether the entry of default was inappropriate in the first instance. If there is evidence that Ms. Arthur satisfied the "or otherwise defend" clause of Super. Ct. Civ. R. 55(a), *see Restaurant Equip. & Supply Depot, Inc., supra,* 852 A.2d at 956, the entry of default may have been inappropriate, or the order should have been vacated at an earlier point in time, as Judge Bowers contemplated. In discussing the "or otherwise defend" clause, Charles Alan Wright, et al., explain:

> The mere appearance by a defending party, without more, will not prevent the entry of a default for failure to plead or otherwise defend, however. But if defendant appears and indicates a desire to contest the action, the court can exercise its discretion and refuse to enter a default. This approach is in line with the general policy that whenever there is doubt whether a default should be entered, the court ought to allow the case to be tried on the merits.

*Id.* § 2682 at 18 (footnotes omitted). Despite the fact that Mr. Arthur filed his complaint in 1980 and took steps to sell the marital property in 1981, Ms. Arthur, who testified as to her fear of Mr. Arthur and her belief that the lender had foreclosed on the home, did not receive notice until 1997 or 1998 that the marital home actually had been sold, despite the fact that Mr. Arthur knew she lived with her parents in Philadelphia after she left the marital home in 1980. In addition, Ms. Arthur telephoned the judge's chambers to explain her absence due to her residence in South Carolina; appeared at a hearing in November 1997; requested counsel to defend her; gave a deposition in June 1998; testified at a hearing in October 1998, as well as at trial, in 2000; and earlier had appeared at a hearing held in December 1998. The trial court should consider in the first instance whether these actions on her part satisfied the "or otherwise defend" clause of Rule 55(a), and whether her sworn testimony represented the equivalent of a verified answer to Mr. Arthur's amended cross-claim.

In addition to the "good cause" requirement of Rule 55(c), the trial court on remand must address the exceptions to the mandate in Rule 55(c) that a verified answer be filed. Only one of the exceptions may fit this case, as appellees argue, that is, the filing of "a settlement agreement or a proposed consent judgment signed by both parties" with the motion to vacate default. Whether the February 9, 1981 stipulation between Mr. Arthur and Mr.

Kamins agreeing that the Arthurs were entitled to receive the remaining funds on the sale of the marital property as tenants by the entireties would satisfy this exception even though Ms. Arthur did not sign it is a matter for initial consideration by the trial court.

### The $14,500.00 principal

Mr. Arthur maintains that even if Ms. Arthur's claim is before the court, the entire principal sum of $14,500.00 paid into the court registry should be distributed solely to him. Consequently, once the trial court resolves the default issue on remand, the question as to the distribution of the $14,500.00 also should be addressed on remand. The trial court ruled that because the note and deed on the property were void as a matter of law, Mr. and Ms. Arthur are "entitled to the entire $14,500.00 as tenants by the entirety," and ordered the D.C. Treasurer "to forthwith issue a check to them."[16] However, prior to any distribution of this sum, the trial court must determine whether Mr. and Ms. Arthur have consented to a partition of the property which they acquired as tenants by the entireties. In the event Mr. and Ms. Arthur have consented to a partition, then the court must determine the relative equities of each in the marital property.

We turn first to the factual underpinning of our discussion of these issues. Counsel for Mr. Arthur and Mr. Kamins executed and filed a stipulation on February 9, 1981, paragraph 4 of which provided:

> Upon entry of final judgment in this case, and disposition of any appeal therefrom, the Court shall disburse to Washington Title and Abstract Corporation any portion of the $14,500.00 that is not ordered paid over to defendants in satisfaction of the note. Washington Title and Abstract Corp. shall then disburse such amount to [Mr.] Arthur and [Ms.] Arthur in accordance with their equities in said property [that is, the marital home].

At the July 2000 trial, Ms. Arthur's mother, Nellie Gibson, testified that she and her husband gave Ms. Arthur $1,500.00 in the 1970s as a gift to assist with the purchase of a home. Subsequently, at Ms. Arthur's request, Ms. Gibson and her husband let Ms. Arthur have an additional sum of $1,300.00. During her testimony, Ms. Arthur stated that at the time of purchase, she "was working" and was "the only one that ever paid the house note, and [her] parents had given [her] money and [she] had borrowed money occasionally [to] keep[ ] the notes going . . . ." Ms. Arthur was employed at a fish market owned by her brothers-in-law. Mr. Arthur made improvements to the marital property: "added on a sun deck"; "extended the carport"; and "made a subbasement." Ms. Arthur "paid for the materials." Mr. Arthur used his veteran's benefits to obtain a loan to purchase the marital home, but other than a period of three months during which he worked and gave Ms. Arthur $50 per week, he did not assist with family expenses. Ms. Arthur voiced her belief that she was entitled to the money in the court registry, even though counsel for Mr. Arthur "told [her] that the money was not [hers], that it was [her] husband's money, and that he was going to win the money for my husband."[17] Mr.

---

16. The noteholder did not appeal the trial court's ruling.

17. Ms. Arthur stated:

> I feel that if anyone should have this money, as hard as I struggled all those years trying to keep that house, and my husband did not work but three months the whole time there, I feel as though I should get the

Arthur did not testify, but Judge Mize summarized the respective efforts of both Mr. and Ms. Arthur as follows:

I think it's very reasonable to infer from [Ms.] Arthur's testimony that the property was acquired during their marital years, and she put up money, and he put up his energy and attention and helped close the deal. And then [he] put sweat labor into improving the property thereafter.

■ It is undisputed that Mr. and Ms. Arthur held their home as tenants by the entireties. We have said previously that:

A tenancy by the entirety is a form of concurrent ownership which resembles a joint tenancy, but exists only between a husband and wife. This form of concurrent ownership is a product of the common-law doctrine that a husband and wife are one person and are each seized of the entire estate. The most significant incidents of this concurrent estate are the unilaterally indestructible right of survivorship; the inability of either spouse, acting alone, to alienate his [or her] interest in the property; and the broad immunity from the claims of separate creditors .... As long as the parties are united in marriage, neither spouse can effectively convey an interest in the estate nor compel a partition of the property without the other's consent.

*Travis v. Benson,* 360 A.2d 506, 509 (D.C. 1976) (citations omitted); *see also Finley v. Thomas,* 691 A.2d 1163, 1165 & n. 1 (D.C.1997); *Ridgely v. Ridgely,* 188 A.2d 296, 297 (D.C.1963) (citation omitted). But

money, my parents be reimbursed the money that they have given to me .... [M]y husband has not contributed one penny and not one house note at all, ever, not ever. And everything that was bought in that house from materials to furniture, everything, I did. And that sums it up.

this jurisdiction permits a judicially ordered partition[18] of lands under D.C.Code § 16–2901 (2001). And, a cotenant enjoys a unilateral right of partition. *See Carter v. Carter,* 516 A.2d 917, 919 (D.C.1986). This unilateral right of partition "makes it possible for any dissatisfied cotenant to, in effect, withdraw from and dissolve the quasi-partnership that cotenancy entails." *Id.* Nevertheless, as we said in *Carter,* "the right to partition, while normally an integral part of the cotenancy form of ownership, is like most property rights subject to possible limitation by voluntary act of the parties or in its initial creation." *Id.* at 921. In addition, "[a]s long as the parties are united in marriage [as apparently are Mr. and Ms. Arthur], neither spouse can effectively convey an interest in the estate nor compel a partition of the property without the other's consent." *Travis, supra,* 360 A.2d at 509 (citing *Ridgely, supra,* 188 A.2d at 297) (other citations omitted); *see also Roberts & Lloyd, Inc. v. Zyblut,* 691 A.2d 635, 638 (D.C.1997) ("[I]n the absence of an agreement to the contrary, each spouse retains a tenancy by the entireties in the proceeds from the sale of property held as a tenancy by the entireties.") (citation omitted); *Verges v. Verges,* 193 A.2d 208, 209 (D.C.1963) ("[W]here there is no consent, and no divorce, the court is powerless to partition or award to one party property held by the entireties") (citing *Hogan v. Hogan,* 102 U.S.App. D.C. 87, 250 F.2d 412 (1957)).

Here, to support his argument that he is entitled to the entire $14,500.00 sum, Mr. Arthur maintains that "[he] consented to

18. "Partition means the division of the land held in cotenancy into the cotenants' respective fractional shares. If the land cannot be fairly divided, then the entire estate may be sold and the proceeds appropriately divided." 7 RICHARD R. POWELL, POWELL ON REAL PROPERTY § 50.07 at 50.37 (Michael Allan Wolf ed., 2004).

the partition of the funds held in the court registry when he filed his ... [a]mended [c]ross-[c]laim against [Ms.] Arthur." And, "in her November 1997 letter, [Ms.] Arthur consented to the partition by stating she withdrew 'any claim or rights to refund or monies in question.'" But, the District argues that "Ms. Arthur is entitled to all of the proceeds pursuant to the 1981 Stipulation signed by Mr. Arthur's counsel in his behalf" where he "expressly agreed that if the original defendants were not entitled to all of the $14,500 in satisfaction of the note in that amount, the remaining portion should be disbursed ... to [Mr.] Arthur and [Ms.] Arthur *in accordance with their equities in said property*," (emphasis in original); and furthermore, as to the respective equities in the marital property, "the uncontradicted evidence is that Ms. Arthur, by working, through her family, and by her desperate loans, furnished the down payment and made all of the mortgage payments on the house from 1976 to 1980 (to the extent that payments were made)." [19]

■ Relying on *Roberts & Lloyd* and *Finley, supra,* the trial court correctly applied some of the fundamental principles relating to property held by a husband and wife. The trial court ruled, however, that: "There has been no unequivocal effort by Mr. and M[s]. Arthur to have the property conveyed in a form other than as tenants by the entiret[ies]," and therefore, "[s]uch

property remains a *tenancy by the entireties* even if it moves from realty to chattle or cash, which is what happened here." In reaching this conclusion, the trial court did not specifically consider evidence regarding the respective equities of Mr. and Ms. Arthur; nor did it consider specifically, evidence (such as Ms. Arthur's written communication of November 1997, and her subsequent July 2000 testimony or Mr. Arthur's amended cross-claim against Ms. Arthur) relating to whether either Ms. Arthur or Mr. Arthur actually sought and consented to a partition; or whether they jointly agreed to a partition of property held as tenants by the entireties. In the absence of such findings, we are constrained to direct that on remand the trial court make findings as to whether Mr. and Ms. Arthur have consented to a partition and, if they have consented, as to their relative equities.

### Interest on Funds Deposited in the Court Registry

We begin with background information relating to the claims for interest. During his oral resolution of issues on July 26, 2000, Judge Mize did not address Mr. Arthur's claim for interest on sums deposited in the court registry (the $14,500.00 in proceeds remaining from the sale of the marital home; and the court-ordered $350.00 paid by Mr. Arthur). Instead, Judge Mize informed the parties that they

---

**19.** The District does not represent Ms. Arthur, and Ms. Arthur did not notice an appeal in this case. Nor did the District file a cross-appeal. Nevertheless, the District has made arguments on appeal which support Ms. Arthur. Mr. Arthur contended that the District lacked standing to raise claims on behalf of Ms. Arthur, and prior to oral argument moved to strike portions of the District's brief. We denied his motion to strike. The District has standing because it confronts "an actual or imminently threatened injury" that is, the potential liability to pay interest to Mr. Arthur.

See *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1206–07 (D.C. 2002); *Hazel v. Barry,* 580 A.2d 110, 111 (D.C.1990); *Hooker v. Edes Home,* 579 A.2d 608, 612 n. 9 (D.C.1990). Because Ms. Arthur is not pressing a claim of interest against the District, if it is decided that she— not Mr. Arthur— owns the underlying property (and, with it, any claim to the interest)— the District will have no obligation to pay interest. Thus, the District has a direct financial stake in supporting the position that Ms. Arthur is the owner of the underlying funds.

should file post-trial motions. Neither the District nor Mr. Arthur followed the trial court's suggestion. Rather, the District submitted a brief on the interest issue. And, Mr. Arthur lodged a motion for leave to file a supplemental complaint; this motion was denied.[20] In its September 13, 2000 "brief on the issue of interest" the District made several arguments.[21] The trial court did not address the District's specific arguments, but in a short order filed on October 4, 2000, "agree[d] with the District's [ ] arguments that there is no legal basis for interest to accrue in plaintiffs' favor on the Stipulated Proceeds (or on $350 ordered to be returned to [Mr.] Arthur on August 31, 1999)." Because the February 1981 stipulation did not specify interest, Judge Mize concluded "the parties waived their right [to interest] by virtue of their signing the stipulation." The order did not mention specifically the constitutional arguments under the Fifth Amendment "takings" clause, nor the discussion of that issue in a hearing before Judge Bowers on December 19, 1997.

In post-appellate oral argument filings, the District maintains that Mr. Arthur did not properly challenge the trial court's order denying prejudgment interest, and Mr. Arthur argues that he did and his main brief on appeal discusses the issue. We are satisfied that Mr. Arthur properly

raised and addressed the interest issue in the trial court and on appeal both in his main and reply briefs. Mr. Arthur squarely raised the interest issue in his August 6, 1997, motion for summary judgment against the District, even asserting that the interest earned on the $14,850.00 sum from February 17, 1988 to August 6, 1997, amounted to $8,000.00. And, in his proposed conclusions of law, Mr. Arthur specifically cited *Webb's Fabulous Pharms., supra,* note 8. He also had asserted the constitutional claim in his earlier March 12, 1999 motion for leave to file supplemental complaint. Count VI of that complaint was styled, "Constitutional Violation: 5th Amendment." He claimed a "property right in the interest that was earned, or should have been earned, on the registry funds," and alleged that his "property has been taken by the defendants ... [without] just[ ] compensation." A virtually identical claim was contained in the supplemental complaint attached to his August 18, 2000 motion for leave to file supplemental complaint. The trial court denied these motions.

In considering the arguments by Mr. Arthur, the District, and *amici curiae;* in reviewing the trial court's short order denying prejudgment interest which does not specifically reflect consideration of all ar-

---

**20.** The supplemental complaint tendered showed as defendants Ms. Arthur, Mr. Kamins and the District. It contained allegations and five counts relating to: (1) a final accounting; (2) restitution; (3) conversion; (4) fraud; and (5) a violation of the Takings Clause of the Fifth Amendment. On March 12, 1999, Mr. Arthur had sought leave to file a virtually identical supplemental complaint containing a Takings Clause claim.

**21.** The District's arguments included the following: (1) No request for interest was made in the February 1981 Stipulation; (2) under Superior Court Administrative Order No. 94–26 relating to interest income from funds held

in the court registry (not further identified except for the text), Mr. Arthur was not entitled to interest; (3) no statute nor court order required the District to place the sums deposited with the court in an interest-bearing account (this argument challenged "[p]laintiffs' reliance on *Phillips v. Washington Legal Found.,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) and *Webb's Fabulous Pharms.,* [*supra,* note 8]," both involving interest issues on deposited funds); (4) the doctrines of laches and clean hands bar Mr. Arthur from seeking interest; and (5) the District government had no fiduciary duty toward Mr. Arthur.

guments presented to the court regarding interest; and in examining the record as a whole, we conclude that the purely legal question can be resolved in this appeal, but that part of the interest issue must be remanded to the trial court for resolution of such factual questions as:

(1) How much interest, if any, has been earned on each of the sums deposited with the Superior Court? What was the amount of administrative costs or bank fees incurred in administering each of the sums deposited?

(2) If no interest was earned on the deposited sums, or if interest on these sums was earned only in some but not all of the years since deposit, or if it is impossible to determine how much interest may have been earned on these sums, did the District have a fiduciary duty to see that interest was earned, and that it could be computed? Did Mr. Arthur's delay in or failure to serve Ms. Arthur in 1982, as ordered by Judge Hannon, occasion the difficulty in tracking the funds deposited in the court registry and any interest earned on those funds?

To facilitate final resolution of the interest question through the application of pertinent legal principles to the trial court's factual findings, which we review under a clearly erroneous standard, we now address the constitutional Fifth Amendment takings issue since our review of purely legal questions is *de novo*. *See* D.C.Code § 17–305 (2001); *M. Pierre Equip. Co., Inc. v. Griffith Consumers Co.*, 831 A.2d 1036, 1038 (D.C.2003) ("We review the legal issues *de novo*.").

Applying the principle of "interest follows principal," the Supreme Court of the United States held in *Phillips v. Washington Legal Found.*, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) "that the interest income generated by funds held in IOLTA [Interest on Lawyers Trust Account] accounts is the 'private property' of the owner of the principal." *Id.* at 172, 118 S.Ct. 1925. However, the court did not address whether there was an unconstitutional taking within the meaning of the Fifth Amendment takings clause.[22] Earlier, in *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), however, a case concerning interest on an interpleader fund deposited in a court registry, the Supreme Court reached the question whether a "taking" had occurred under the Fifth Amendment. In a narrowly crafted holding, based in part upon the existence of a state statute, the court declared:

We hold that under the narrow circumstances of this case—where there is a separate and distinct state statute authorizing a clerk's fee "for services rendered" based upon the amount of principal deposited; where the deposited fund itself is concededly private; and where the deposit in the court's registry is required by state statute in order for the depositor to avail itself of statutory protection from claims of creditors and others—Seminole County's taking unto itself, under [Florida law], the interest earned on the interpleader fund while it was in the registry of the court was a taking violative of the Fifth and Fourteenth Amendments. We express no view as to the constitutionality of a statute that prescribes a county's retention of interest earned, where the interest would be the only return to the country for services it renders.

*Id.* at 164–65, 101 S.Ct. 446. Not only did *Webb's Fabulous Pharms.*, reinforce "[t]he

22. The Fifth Amendment to the Constitution of the United States provides in pertinent part: "[N]or shall private property be taken for public use without just compensation."

usual and general rule ... that any interest on an interpleaded and deposited fund follows the principal and is to be allocated to those who are ultimately to be the owners of that principal, ...," *id.* at 162, 101 S.Ct. 446 (citation omitted), but it also emphasized that:

[A] State, by *ipse dixit*, may not transform private property into public property without compensation, even for the limited duration of the deposit in court. This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent. That Clause stands as a shield against the arbitrary use of governmental power.

*Id.* at 164, 101 S.Ct. 446.

◼ As its takings jurisprudence has evolved, the Supreme Court has distinguished between two types of takings, a "physical taking" and a "regulatory taking." *See Brown v. Legal Found. of Washington,* 538 U.S. 216, 233, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003) ("The text of the Fifth Amendment provides a basis for drawing a distinction between physical takings and regulatory takings."). Where there has been a physical taking, or what is sometimes called a categorical taking or a *per se* taking, just compensation is required in accordance with "a clear rule." *Id.* ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner ...") (citing *United States v. Pewee Coal*

*Co.,* 341 U.S. 114, 115, 71 S.Ct. 670, 95 L.Ed. 809 (1951)). In contrast, a regulatory taking, involving "regulations that prohibit a property owner from making certain uses of [his or] her private property," *id.,* "entails complex factual assessments of the purposes and economic effects of governmental actions," *id.* at 234, 123 S.Ct. 1406, before ascertaining whether a regulation amounts to an unconstitutional taking requiring just compensation has occurred. *See also Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 321–24, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

◼ Where there "is a forced contribution to general governmental revenues, and it is not reasonably related to the costs of using the courts," *Webb's Fabulous Pharms.,* 449 U.S. at 163, 101 S.Ct. 446, an unconstitutional taking, which may require just compensation, has occurred.[23] Whether such a taking requires payment of just compensation depends upon "the property owner's loss rather than the government's gain." *Brown v. Legal Found. of Washington,* 538 U.S. 216, 235–36, 123 S.Ct. 1406, 155 L.Ed.2d 376 (2003). Here, as the Supreme Court did in *Brown,* we "assume that [Mr. and/or Ms. Arthur] retain[ ] the beneficial ownership of at least a portion of the[ ] escrow deposits until all the funds [are] disbursed at the [end of this litigation], that those funds [have] generated some interest ...,"[24] and that their

---

23. In light of this legal principle, the District's argument that Mr. Arthur voluntarily deposited $14,450.00 in the court registry, and hence the takings clause does not apply, is unavailing. While Mr. Arthur voluntarily deposited the $14,450.00, but not the $350.00, he did not by that action signal that the government had a right to take and use private funds resulting from the sale of private property, including interest thereon, in any way it deemed necessary or appropriate.

24. Mr. Arthur believes that at least $8,000.00 in interest has been (or should have been) generated by the court registry deposits between February 1988 and August 1997, and amici estimate in their brief that "[m]ore than $35,000.00 in interest has accrued on these funds, as of June 30, 1998, though the actual amount is not determined." Apparently the Superior Court is not required to, but may, place court registry funds in interest bearing accounts at its discretion. *See* Super. Ct. Civ. R. 67. Unlike Fed.R.Civ.P. 67, which

interest was taken for a public use when it was ultimately turned over to the [D.C. Treasurer]." [25] *Id.* at 235, 123 S.Ct. 1406. If the sums deposited in the court registry were placed in interest bearing accounts initially, or if the practice of Superior Court prior to 1994 or the court's fiduciary obligations required placing voluntary or court-ordered deposits in interest bearing accounts, *Webb's Fabulous Pharms., Inc., supra,* note 8, dictates that the interest belonged to the owners of the principal. We are loathe to interpret the silence of February 9, 1981 stipulation between Mr. Arthur and Mr. Kamins concerning interest as a waiver of that constitutional right where its inclusion would have benefitted both parties.

■ Thus, on remand, the trial court must determine factually whether one or the other or both of the Arthurs sustained "net losses" since "any pecuniary compensation must be measured by . . . [their] net losses rather than the value of the public's gain." *Id.* at 237, 123 S.Ct. 1406; *see also Schneider v. California Dep't of Corrs.,* 345 F.3d 716 (9th Cir.2003) (Because "the Fifth Amendment does not proscribe the taking of property [but] it proscribes taking without just compensation," on remand

the trial court must determine "whether the interest earned by [the owner's] principal is exceeded by his [or her] share of the costs of administering the [$14,850.00]"). *Id.* at 720, 721 (citation omitted). In other words, the trial court must find whether there would be any net return on any interest generated by the $14,850.00. Without any factual findings as to the administrative cost required to administer the $14,850.00 sum, or the bank charges imposed, we cannot at this stage of the litigation, determine whether the Arthurs suffered "net losses" on the sums deposited in the court registry and transferred to the D.C. Treasurer.

Accordingly, for the foregoing reasons, we vacate the judgment in this matter and remand the case to the trial court with instructions to address three matters consistent with this opinion: (1) the appropriate standard governing its decision to vacate the entry of default against Ms. Arthur; (2) the question of ownership of the $14,500.00 principal paid into the court registry, and whether Mr. and Ms. Arthur have consented to a partition of their marital property which they acquired as tenants by the entireties and if they have

was amended in 1983, Super. Ct. Civ. R. 67 does not contain the language, "shall be deposited in an interest-bearing account or invested in an interest-bearing instrument approved by the court." In addition, Superior Court Administrative Order No. 94–26, adopted on November 2, 1994, provides:

> Amounts ordered to be held in escrow in the Court registry generally do not provide any interest income payable to a party in a case. Interest income from amounts held in the registry is used to offset various bank service charges and to provide revenue for the District of Columbia's General Fund.
>
> In extraordinary circumstances where a large sum is to be held by the Court for a reasonably long period of time, a unique interest bearing account can be established

to pay interest to designated parties upon disposition. Before any order establishing such an account is entered, the approval of the Chief Judge must be obtained.

Administrative Order No. 94–26 of course did *not exist* when Mr. Arthur deposited the $14,500.00 sum and the mandated sum of $350.00 into the court registry.

**25.** During consideration of the interest issue in 1997, the Fiscal Officer for the District's courts, submitted an affidavit stating in part: "It is the practice of the District of Columbia Courts for all interest earned on funds held in its general civil escrow account, be used to first pay bank service charges, with the balance deposited as revenue to the District's General Fund." (Schulthesis Aff. September 9, 1997).

consented, their relative equities in the property; and (3) the determination of how much, if any, interest was earned on the $14,500.00 principal sum and the court-ordered $350.00 security deposited in the court registry and later transferred to the District's general fund, and wheth-er the District had a fiduciary duty to see that interest was earned and computed.

*So ordered.*